ROUCH v ENQUIRER & NEWS OF BATTLE CREEK
(AFTER REMAND)

Docket No. 89799. Argued December 3, 1991 (Calendar No. 2). Decided July 15, 1992. Rehearing denied *post,* 1209. Certiorari denied by the Supreme Court of the United States on March 1, 1993, 507 US — (1993).

David J. Rouch brought a libel action in the Calhoun Circuit Court against the Enquirer and News of Battle Creek, claiming that an article describing his arrest as a suspect in the rape of a seventeen-year-old girl who was baby-sitting for his former wife was false. The court, Stanley Everett, J., granted summary disposition for the defendant, ruling that the newspaper was entitled to a qualified privilege in matters of general public interest and that the plaintiff was unable to establish a genuine issue of material fact regarding malice by the newspaper. The Court of Appeals, MAHER, P.J., and GRIBBS and K. N. SANBORN, JJ., reversed, stating that the statutory privilege was unavailable because no warrant was issued, that the details of the alleged crime fell outside the scope of matters promoting the public interest, and that the trial court erred in requiring a showing of malice (Docket No. 66177). The Supreme Court affirmed, holding that an arrest, absent judicial action, falls outside the scope of the public and official proceedings statute, and that the common-law, public-interest privilege has been subsumed in federal constitutional law, adopted negligence as the standard for determining liability, and remanded the case to the trial court, instructing that the plaintiff bore the burden of proving falsity. 427 Mich 157 (1986). On remand, the court, Stephen B. Miller, J., entered judgment on a jury verdict for the plaintiff. The Court of Appeals, MURPHY, P.J., and NEFF, J. (G. S. ALLEN, J., dissenting), affirmed (Docket No. 108595). The defendant appeals.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

The plaintiff offered insufficient evidence to establish material falsity.

1. A cause of action for libel requires the showing of a false

REFERENCES

Am Jur 2d, Libel and Slander §§ 178-182, 289-310, 333, 406-420.
See the Index to Annotations under Libel and Slander.

and defamatory statement concerning the plaintiff, an unprivileged communication to a third party, fault amounting to at least negligence on the part of the publisher, and either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. A litigant additionally must comply with constitutional requirements focusing on the public- or private-figure status of the plaintiff, the media or nonmedia status of the defendant, and the public or private character of the speech. In this case involving a private plaintiff, a media defendant, and a publication regarding an area of public concern, the constitution requires that the plaintiff bear the burden of proving falsity by establishing at least that publication of the communication was negligent.

2. In a libel case affecting constitutionally protected public discourse, an appellate court must independently review the record with regard to falsity. The definition of falsity remains grounded in the common law. A claim for libel is predicated on whether the article was substantially true. Liability should not be imposed for slight inaccuracies. The sting of the article and its effect on the reader should be examined. If the literal truth would produce the same effect, minor differences are immaterial. In this case, use of the word "charge" in the absence of a formal arraignment cannot be deemed materially false. The word is an umbrella term covering all stages of the charging process. Although in legal terminology it is used in contradistinction to "conviction," in the popular sense, it is used as a synonym for "accuse." Even if its use, in the technical formal sense, was inaccurate, it cannot be a basis for liability because that would eviscerate the breathing space required to protect First Amendment rights. On the basis of an independent review of the record, the use of the word "charge" did not render the article materially false. Likewise, minor inaccuracies did not alter the substantial truth of the article. Its gist or sting was that the plaintiff was arrested on the basis of the identification of persons who knew him and was charged with first-degree criminal sexual conduct. Neither of the asserted errors altered the gist or sting.

Vacated and remanded.

Justice RILEY, joined by Justice GRIFFIN, concurring, stated that, as a threshold matter, the plaintiff's failure to allege and identify in his pleadings, supplemental pleadings, and answers to the defendant's interrogatories, specifically which statements he considered to be materially false and how the newspaper either was negligent or reckless in publishing the story were

proper grounds for a grant of summary judgment by the trial court.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that there is sufficient evidence of material falsity.

The article in dispute contains inaccuracies. The issue, however, is not merely whether there are inaccuracies, but whether the inaccuracies constitute material falsity. The test is whether the evidence supports the finding that the article was materially false in that the "sting" of the article would have an effect on the mind of the reader different from the literal truth. In determining whether the concededly false aspects of the publication are significant, for defamation purposes, in relation and comparison to the concededly true portions, the inquiry necessarily goes beyond the strictly factual level and requires interpreting the likely effect of the publication on the reader's mind and the likely meaning conveyed.

In reviewing a libel verdict, an appellate court should not review credibility determinations, disregard previous fact findings, or create new fact findings. Rather, it should exercise independent judgment regarding whether, as a matter of law, the evidence in the record supports the verdict. In this case, it is important to recognize that a jury, adequately instructed with respect to material falsity, reached a conclusion regarding the likely effect of the article on the mind of an average reader. As purely factual matters, the statements that the plaintiff's own children had identified him as the assailant and that he had been charged with criminal sexual conduct were false. The misidentification of his stepchildren as his children is not inconsequential. Even if this question is seen as a close issue, it cannot be concluded that the reader would not have had a different reaction had the literal truth been reported. With regard to the declaration that the prosecutor had authorized the charge, even though newspapers should not be held to technical legal language, the effect on the mind of the reader was materially different from the effect that would have resulted from the actual truth. Read as a whole, the article in this case conveyed the impression that there was overwhelming evidence and that judicial proceedings had been instituted.

Justice LEVIN, writing separately, stated that it is not defamatory by itself to describe an arrest as a "charge." The article in question, however, reported not only that Rouch had been arrested and charged, but also that the charge had been authorized by the prosecutor, suggesting far more than an ordinary arrest, i.e., that there was overwhelming evidence and that judicial proceedings had been instituted.

The position that the plaintiff failed adequately to state facts,

justifying summary disposition, does not withstand scrutiny. Such a claim cannot properly be raised after trial has commenced, let alone for the first time in the Supreme Court and without even an assignment of error.

184 Mich App 19; 457 NW2d 74 (1990) vacated.

1. LIBEL AND SLANDER — NEWSPAPERS — PRIVATE PERSONS — NEGLIGENCE.

A cause of action for libel requires the showing of a false and defamatory statement concerning the plaintiff, an unprivileged communication to a third party, fault amounting to at least negligence on the part of the publisher, and either actionability of the statement irrespective of special harm or the existence of special harm caused by publication; a litigant additionally must comply with constitutional requirements focusing on the public- or private-figure status of the plaintiff, the media or nonmedia status of the defendant, and the public or private character of the speech; the plaintiff bears the burden of proving falsity by establishing the publication of the communication was negligent (US Const, Am I).

2. LIBEL AND SLANDER — NEWSPAPER ARTICLES — SUBSTANTIAL TRUTH — STING.

A claim for libel based on a newspaper article is predicated on whether the article was substantially true; liability should not be imposed for slight inaccuracies; rather, the sting of the article and its effect on the reader should be examined; if the literal truth would produce the same effect, minor differences are immaterial.

*John M. Jereck* for the plaintiff.

*Nixon, Hargrave, Devans & Doyle* (by *Robert C. Bernius* and *Sharon Ochs Boston*) and *Sullivan, Hamilton, Schulz, Allen & Lettering* (by *James M. Sullivan*) for the defendant.

Amici Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink* and *Michael A. Gruskin*); *Mendes & Mount,* of counsel (by *Edward G. Spacek* and *Glenn M. Bieler*), and *Samuel A. Terilli,*

*Jr.,* General Counsel, for Detroit Free Press, Inc., and David Lawrence, Jr.

*Kasiborski, Ronayne & Flaska, P.C.* (by *John J. Ronayne, III*), for Post-Newsweek Stations, Michigan, Inc., and Adams Publishing Corporation.

*Butzel, Long* (by *Richard E. Rassel, James E. Stewart, Leonard M. Niehoff,* and *Kevin F. O'Shea*) for The Detroit News, Inc.

*Marco, Litzenburger, Smith, Brown & Erhart, P.C.* (by *Seberon Litzenburger*), for Northern Michigan Review, Inc., Otsego County Herald Times, Inc., Maurer Publishing Company, Cadillac Evening News, and Silbar Communications.

*Dawn L. Phillips* and *Karen Russell* for Michigan Press Association.

AFTER REMAND

BOYLE, J.

A responsible press has always been regarded as the handmaiden of effective judicial administration . . . . Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. [*Sheppard v Maxwell,* 384 US 333, 350; 86 S Ct 1507; 16 L Ed 2d 600 (1966).]

In this case we are called upon to examine the balance between protecting an individual's reputation from false and defamatory statements and fostering energetic, tumultuous public debate to ensure continued scrutiny of police, prosecutors, and the courts through cherished constitutional

rights guaranteeing freedom of speech and the press.[1] Newspapers have a longstanding tradition of reporting on criminal justice and police conduct. "With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broadcasting Corp v Cohn*, 420 US 469, 492; 95 S Ct 1029; 43 L Ed 2d 328 (1975). Protecting that tradition without trampling the rights of individual citizens is the task facing this Court.

The plaintiff, David Rouch, was arrested, booked on a charge of first-degree criminal sexual conduct by the police upon authorization from an attorney in the prosecutor's office, and released after an informal bond hearing by a magistrate acting in her formal capacity pursuant to MCR 6.104. The defendant newspaper, the Enquirer & News of Battle Creek, published an account of Rouch's arrest, the charge against him, and his release on bond. Later, when Rouch appeared for his formal arraignment, he was told that the charges had been dropped. Rouch predicates his suit upon inaccuracies in the newspaper report.

Perhaps it is not surprising that with such important rights at stake, this controversy has required so much appellate court time.[2] When this Court first considered the case, it reviewed an

---

[1] Both of these values are explicitly embodied in Const 1963, art 1, § 5:

> Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.

[2] This case began more than a decade ago and has been considered twice by the Michigan Court of Appeals and once by this Court. See 137 Mich App 39; 357 NW2d 794 (1984); 184 Mich App 19; 457 NW2d 74 (1990); 427 Mich 157; 398 NW2d 245 (1986).

abbreviated record prepared prior to a summary disposition motion to determine "the applicability of Michigan's statutory 'public and official proceedings' statute, MCL 600.2911(3); MSA 27A.2911(3), and the viability of its common-law qualified public-interest privilege." 427 Mich 157, 160; 398 NW2d 245 (1986). With further factual development, the matter returns to this Court for additional review. We now consider whether the defendant published a materially false article. We need not reach the issue whether it was negligently published,[3] and whether the more complete factual record brings the case within Michigan's statutory privilege.[4]

---

[3] Because of our resolution of the material falsity issue, we need not resolve the question of negligence. Nevertheless, we observe that plaintiff's theory regarding fault apparently was that the newspaper reporter had been poorly trained and consequently failed to further investigate information provided to him by the police. The existence and scope of any constitutionally based doctrine of neutral reportage remains as yet undefined. See *Smith v Daily Mail Publishing Co*, 443 US 97, 102; 99 S Ct 2667; 61 L Ed 2d 399 (1979) ("state action to punish the publication of truthful information seldom can satisfy constitutional standards"); *The Florida Star v BJF*, 491 US 524; 109 S Ct 2603; 105 L Ed 2d 443 (1989); *Butterworth v Smith*, 494 US 624; 110 S Ct 1376; 108 L Ed 2d 572 (1990); *Landmark Communications, Inc v Virginia*, 435 US 829; 98 S Ct 1535; 56 L Ed 2d 1 (1978); *Oklahoma Publishing Co v District Court*, 430 US 308; 97 S Ct 1045; 51 L Ed 2d 355 (1977); *Greenbelt Cooperative Publishing Ass'n v Bresler*, 398 US 6; 90 S Ct 1537; 26 L Ed 2d 6 (1970); *Cox Broadcasting Corp v Cohn*, supra. Other state and federal courts have questioned the extent to which newspapers should be required to verify information obtained from governmental sources such as police reports absent evidence that the publisher had good reason to suspect falsity. *Torres-Silva v El Mundo*, 3 Media L Rptr 1508, 1512 (PR, 1977); *Wilson v Capital City Press*, 315 So 2d 393 (La App, 1975); *Appleby v Daily Hampshire Gazette*, 395 Mass 32; 478 NE2d 721 (1985); *LaMon v Butler*, 44 Wash App 654; 722 P2d 1373 (1986); *Walters v Sanford Herald, Inc*, 31 NC App 233; 228 SE2d 766 (1976); *Ricci v Venture Magazine, Inc*, 574 F Supp 1563 (D Mass, 1983). In this case, there was no suggestion that the information was inherently implausible. Nor was there any proof or allegation that cast doubt on the accuracy of the police report regarding Rouch's arrest.

[4] In *Rouch I*, I was unwilling to hold that the statutory privilege had been subsumed. The factual predicate for assertion of the statutory privilege is contained in the record. Although I would conclude

We hold that the article was not materially false,[5] and we therefore reverse the decision of the Court of Appeals and remand for entry of judgment notwithstanding the verdict in favor of the defendant.

I

A. THE PROCEDURAL HISTORY

On December 5, 1980, David Rouch commenced this libel action against the Enquirer & News of Battle Creek by filing a complaint in the Calhoun Circuit Court. Rouch claimed that the newspaper had falsely published an article describing his arrest as a suspect for the rape of a seventeen-year-old girl who was baby-sitting for his former wife. After initial discovery, the newspaper filed a motion for summary disposition, seeking an order of no cause of action because the newspaper was entitled to qualified privilege under the terms of MCL 600.2911(3); MSA 27A.2911(3). In support of its motion, the newspaper relied on the depositions

that the privilege is applicable to an informal arraignment for bond purposes before a magistrate, see MCL 600.8511 *et seq.*; MSA 27A.8511 *et seq.*, MCL 765.1; MSA 28.888, MCL 600.8512a; MSA 27A.8512(1), and MCR 6.104(G), a majority of the Court being unpersuaded that we should reach this issue, the opinion does not address it.

[5] Contrary to the observation in the separate dissent, the arrest (which Justice LEVIN concedes it is not defamatory to describe as a charge) was authorized by the prosecutor. The record establishes that the Bedford Township police called the assistant prosecutor before they took plaintiff into custody and that the prosecutor, after being "briefed on the complaint and the circumstances surrounding the arrest of suspect advised to lodge" plaintiff on a charge of first-degree criminal sexual conduct. Indeed, the plaintiff acknowledges that the prosecutor authorized the incarceration. If what Justice LEVIN means is that the article should have reported that the prosecutor authorized the incarceration of the plaintiff on the charge of Criminal Sexual Conduct I, as plaintiff contends, we respond to that argument in section IV. If what he means is that there was governmental involvement in the lodging of the charge of CSC I, that is true, and plaintiff does not contend otherwise.

of the plaintiff, affidavits of the news reporter who authored the article, and a police sergeant who provided a copy of the incident report with respect to Rouch's arrest. Relying on *Schultz v Newsweek, Inc,* 668 F2d 911 (CA 6, 1982), the trial court ruled that the newspaper was entitled to a qualified privilege for matters of general public interest. As a result, the trial court concluded that the plaintiff was required to prove actual malice in order to sustain his claim. The trial court granted summary judgment in favor of the defendant on the basis that the plaintiff was unable to establish a genuine issue of material fact regarding the defendant newspaper's malice.

The Court of Appeals reversed the ruling of the trial court, stating that the statutory privilege was unavailable on the basis that no warrant was issued in the case, that the common-law privilege to report matters in the public interest was unavailable because the details of the alleged crime fell outside the scope of matters promoting the public interest, and that the trial court erred in requiring a showing of malice.[6] We granted the defendant leave to appeal.[7]

In *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157; 398 NW2d 245 (1986) (hereafter *Rouch I*), we considered the scope of Michigan's statutory privilege, the continued existence of Michigan's qualified privilege in light of the constitutional dimensions of the law of defamation as developed by the United States Supreme Court in *New York Times Co v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), and its progeny, and the burden of proving falsity. Writing for the majority, Justice BRICKLEY considered the questions of privilege and discussed the applicability of

[6] 137 Mich App 39.

[7] 422 Mich 937 (1985).

the "official proceedings privilege" statute, MCL 600.2911(3); MSA 27A.2911(3). Justice BRICKLEY concluded that an arrest, absent judicial action, falls outside the scope of "public and official proceedings" as covered in Michigan's statute.[8] In rejecting an interpretation of Michigan's statutory privilege that would reach arrests or police reports absent judicial action, Justice BRICKLEY reasoned that the language "evoke[d] notions of adjudicatory action, rather than of government action generally." 427 Mich 172. Justice BRICKLEY further explored the effect of constitutional mandates on the availability of Michigan's public-interest privilege. Concluding that the public-interest privilege had been largely subsumed by the more expansive constitutional protections afforded by the *New York Times* standard, we adopted the *Gertz*[9] negligence standard in place of the former public-interest privilege, 427 Mich 202, and remanded the case to the trial court for further proceedings, with the instruction that the plaintiff bore the burden of proving falsity.

On February 9, 1988, an eight-day trial commenced in circuit court. Witnesses included the news reporter responsible for the story, police officers, the plaintiff, the magistrate responsible for holding the informal bond hearing, and several expert witnesses. Significantly, John Bell, a Battle Creek police officer, testified that the prosecutor, Mr. Pattison, authorized Mr. Rouch to be arrested on the charge of first-degree criminal sexual con-

---

[8] Since our decision in *Rouch I,* the Legislature has amended Michigan's statutory privilege to broaden its scope to cover matters of public record, governmental notices, announcements, and written or recorded reports or records generally available to the public. MCL 600.2911(3); MSA 27A.2911(3), as amended by 1988 PA 396, § 1. See also Nichols, *HB 4932 and the Rouch case: A brief sketch of Michigan libel law,* 1989 Det C L R 689.

[9] *Gertz v Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974).

duct. The defendant introduced a copy of the
police report that detailed the booking of Rouch
for criminal sexual conduct on the basis of the
authorization of Prosecutor Pattison. Officer Bell
also explained that an arraignment for bond pur-
poses was held before the magistrate.[10] Adding to
the factual record in *Rouch I,* which focused on
the facts regarding the arrest and police reports,
the trial record included testimony from the mag-
istrate who was responsible for setting bond. The
magistrate testified that one of her official duties
was to set bond for persons being held in custody.
Although the magistrate did not specifically recall
the details of this hearing, the defendant intro-
duced a bail bond form signed by Rouch which
evidenced a $10,000 personal recognizance bond
with appearance for arraignment required on
December 28, 1979. The form detailed the offense
as criminal sexual conduct in the first degree. The
magistrate agreed that the form indicated that she
had set bond and described the manner in which
such bonds were set. She explained that to set
bond, she would consider the length of the defen-
dant's residence in the community, his employ-
ment status, his reputation and character, his
prior criminal record, his record of appearance or
nonappearance on other occasions, the nature of
the offense, and the probability of conviction.[11]

The defendant renewed its motion for directed

[10] Bell explained that Magistrate Strong sometimes conducted the
proceeding to set a personal recognizance bond over the telephone,
and other times she did it in her office. Bell called the proceeding an
"arraignment for bond purposes." Magistrate Strong agreed that she
sometimes conducted the hearing by telephone. When this was done,
the sheriff's department would prepare the form, and the defendant
would sign it and be released.

[11] Michigan law authorizes magistrates to carry out a wide range of
judicial functions, including setting bond for defendants.. See MCL
600.8511 *et seq.*; MSA 27A.8511 *et seq.* See also MCL 765.1; MSA
28.888 (which authorizes a magistrate to set bail and to let an accused
out of jail on recognizance).

verdict incorporating all its prior arguments, and again raised the contention that the case fell within Michigan's statutory privilege, relying particularly on the magistrate's testimony as evidence of an official proceeding. The jury returned a verdict in favor of the plaintiff and awarded damages of one million dollars. The defendant unsuccessfully moved for judgment notwithstanding the verdict. A stay was granted, and the newspaper appealed in the Court of Appeals.

The Court of Appeals addressed numerous issues in affirming the jury verdict. The Court rejected the defendant's contention that the plaintiff failed to prove that the article was materially false. The Court disagreed with the defendant's assertion that the plaintiff failed to submit sufficient evidence to establish negligence. In addition, the Court disagreed with the defendant's suggestion that publication of the article was within the protection of the official proceedings statute.

We granted the defendant leave to appeal. 437 Mich 1035 (1991).

### B. THE FACTUAL BACKGROUND

This case began on December 21, 1979, with the arrest of David Rouch as a suspect in the rape of his former wife's baby-sitter. Rouch was arrested without a warrant, held by the police, booked on the charge of first-degree criminal sexual conduct, as authorized by the prosecutor, and released on $10,000 personal recognizance bond after an informal hearing before a magistrate.[12] It is undisputed

---

[12] Bedford Township officers, the township where the crime occurred, requested Emmett Township officers to arrest Rouch at his home in Emmett Township. He was placed in the custody of the Bedford Township police. Upon authorization from the Calhoun County Prosecutor's office, Rouch was removed to the county jail in Marshall and booked on a charge of CSC I. The magistrate for the 10th

that Rouch was never formally arraigned on a warrant and that the police eventually pursued another suspect. The facts surrounding Rouch's arrest were set forth in an article published by the Battle Creek News & Enquirer.[13] Mr. Rouch conceded that the article in question and its references to his arrest, booking, and release on bond were accurate. Plaintiff complained, however, about three supposedly material errors. First, plaintiff contended that the article falsely asserted that Rouch was "charged" with sexual assault. Second, the plaintiff complained that the article falsely stated that he was identified by his children when, in reality, he was identified by his former wife's children, his former stepchildren. Third, plaintiff complained that the article was inaccurate in that it asserted that the charge against Rouch was authorized by the Calhoun County Prosecutor's office.

The facts regarding the manner in which the newspaper reporter received the information are in dispute. The reporter claimed that he contacted members of the Bedford Police Department in Calhoun County who relayed the information to him, and that he held the information until he was informed that court action had occurred and Rouch was released on bond with an arraignment set for the following week. Because the reporter could not identify with certainty to whom he spoke at the police department, and the officers who testified could not recall speaking with the reporter about this specific case, the plaintiff suggests that the reporter uncovered the information in some other way.[14]

District Court in Calhoun County released Rouch on a personal recognizance bond until his formal arraignment could be held.

[13] The full text of the article is set forth *infra* at 261.

[14] We need not resolve this factual dispute in view of our resolution of the other issues.

II

A proper determination of the plaintiff's defamation claims requires consideration of the elements of libel under Michigan law in light of the constitutional requirements and principles that shape libel law to be consistent with First Amendment strictures. Michigan adheres to the commonly accepted meaning of a defamatory communication set forth in the Restatement of Torts. *Nuyen v Slater,* 372 Mich 654, 662; 127 NW2d 369 (1964). 3 Restatement Torts, 2d, § 559, p 156, provides:

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

In *Locricchio v Evening News Ass'n,* 438 Mich 84, 115-116; 476 NW2d 112 (1991), we enumerated four components for a cause of action for libel: 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

In addition to satisfying Michigan's common-law requirements for a libel cause of action, a litigant must comply with constitutional requirements. As we recognized in *Locricchio,* analysis under the constitution has focused on three elements: "the public- or private-figure status of the plaintiff, the

media or nonmedia status of the defendant,[15] and
the public or private character of the speech." *Id.*
at 118. In this case involving a private plaintiff, a
media defendant, and a publication regarding an
area of public concern, the constitution requires
that the plaintiff bear the burden of proving fal-
sity. *Philadelphia Newspapers, Inc v Hepps,* 475
US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986).
Further, after *Gertz v Welch, Inc,* 418 US 323, 347;
94 S Ct 2997; 41 L Ed 2d 789 (1974), invited states
to "define for themselves the appropriate standard
of liability for a publisher or broadcaster of defam-
atory falsehood injurious to a private individual,"
this Court adopted negligence as the standard in
Michigan. *Rouch I,* 427 Mich 195.[16] Thus, the
plaintiff must establish that the defendant's publi-
cation of the communication at issue was negli-
gent.[17]

The Court of Appeals affirmed the jury verdict
in this case, ruling that the plaintiff met his
burden of proving falsity, that sufficient evidence
was submitted to establish the defendant's negli-
gence, and that the defendant could not invoke the
protection of Michigan's "official proceedings" stat-
ute, MCL 600.2911(3); MSA 27A.2911(3). *Rouch v
Enquirer & News (On Remand),* 184 Mich App 19;

[15] We noted in *Locricchio* that it is unclear whether the media
status of the defendant necessitates a higher level of protection. 438
Mich 90, n 7. The United States Supreme Court has not yet resolved
the issue.

[16] We reserved for another occasion the question whether the
standard of proof with regard to falsity or negligence is "clear and
convincing evidence" or some lesser standard. *Locricchio,* 438 Mich
123.

[17] We note that both common-law and constitutional questions
regarding the availability of and necessary proofs for damages were
raised in this case. Because of our resolution of the other issues, we
leave these issues for another day.

457 NW2d 74 (1990). We disagree with the ruling on material falsity.[18]

### III

In *Locricchio,* 438 Mich 110-114, we held that in reviewing a libel case affecting constitutionally protected public discourse, an appellate court must independently review the record with regard to falsity. The concept of independent appellate review of the record reflects a longstanding concern that judges "exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Bose Corp v Consumers Union of United States, Inc,* 466 US 485, 511; 104 S Ct 1949; 80 L Ed 2d 502 (1984). Since *New York Times Co v Sullivan, supra* at 285, the United States Supreme Court has emphasized the importance of careful appellate review of the evidence to ensure that constitutional principles are properly applied. There, the Court explained:

> This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across "the line between speech unconditionally guaranteed and speech which may legitimately be regulated." . . . In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the

[18] The Court of Appeals also considered numerous trial court rulings on negligence, the official proceedings statutes, evidentiary matters, and instructional issues. Because we conclude that plaintiff's claim cannot survive review of the initial issue, we need not reach these issues.

Fourteenth Amendment, protect." . . . We must "make an independent examination of the whole record," . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

Reiterating this conclusion in *Time, Inc v Pape,* 401 US 279; 91 S Ct 633; 28 L Ed 2d 45 (1971), the Court underscored its concern that an independent examination of the evidence be conducted. Writing for the majority, Justice Stewart stated:

> Inquiries of this kind are familiar under the settled principle that "[i]n cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will re-examine the evidentiary basis on which those conclusions are founded." [*Id.* at 284.]

Justice Stewart recalled that the occasion for such review "frequently" arose in "the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other . . . ." *Id.*

More recently, the United States Supreme Court revisited the question of the proper standard of appellate review in *Bose Corp v Consumers Union of United States, Inc, supra. Bose* rejected the imposition of the clearly erroneous standard of FR Civ P 52(a) in reviewing a determination of actual malice in cases governed by *New York Times Co v Sullivan, supra.* Recounting the lengthy tradition of independent review in the context of constitutional facts, the *Bose* Court characterized the requirement as "a rule of federal constitutional law" that "emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage . . . reflect[ing] a deeply

held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Bose* at 510-511.

Likewise, the United States Supreme Court independently reviewed the record in *Harte-Hanks Communications, Inc v Connaughton,* 491 US 657; 109 S Ct 2678; 105 L Ed 2d 562 (1989), to conclude that the judgment was supported by clear and convincing proof of actual malice. The Court reiterated its conclusion in *Bose* that the sufficiency of evidence to support a finding of actual malice is a question of law. It emphasized the "unique character of the interest protected by the actual malice standard," *Harte-Hanks* at 686. The Court predicated the rule requiring independent review on the difficulty in giving "content to these otherwise elusive constitutional standards," coupled with the importance of "such elucidation . . . in the area of free speech . . . ." *Id.*

Although the scope of this doctrine had not been clearly delineated by the United States Supreme Court, in *Locricchio,* we concluded that "an independent appellate review of the burden of proof with regard to falsity in private-figure, public-interest cases deters 'forbidden intrusion on the field of free expression' as a logical corollary to independent review of actual malice." *Id.* at 113 (quoting *Sullivan* at 285). We reasoned that *Hepps* abrogated the common-law presumption of falsity in libel cases, creating "an issue of constitutional fact regarding whether a plaintiff carries the burden of proving falsity." 438 Mich 113.[19] We consid-

[19] Constitutional facts have been defined as "facts fundamental to the existence of a constitutional right—for example, whether a confession was coerced or a film was obscene." Louis, *Allocating adjudicative decision making authority between the trial and appellate levels:*

ered that the absence of meaningful appellate review might result in upholding a jury verdict lacking adequate evidentiary support. We analogized this result to a "failure to review for clear and convincing evidence of actual malice," *id.,* and concluded that the promised protection for media defendants afforded by placing the burden of proof on the plaintiffs would "ring hollow" in the absence of meaningful review of the trial court's finding regarding falsity. *Id.* at 114.[20]

The Court has acknowledged that the "appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive." *Miller v Fenton,* 474 US 104, 113; 106 S Ct 445; 88 L Ed 2d 405 (1985). In discussing this problem, the Court at 114, stated:

*A unified view of the scope of review, the judge/jury question, and procedural discretion,* 64 NC L R 993, 995, n 13 (1986). The doctrine of independent review of constitutional facts has arisen in First Amendment and other constitutional contexts. See, e.g., *Jacobellis v Ohio,* 378 US 184, 190; 84 S Ct 1676; 12 L Ed 2d 793 (1964) (the court has an "obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments," and in doing so "cannot avoid making an independent constitutional judgment on the facts of the case"); *Payne v Arkansas,* 356 US 560, 562; 78 S Ct 844; 2 L Ed 2d 975 (1958) ("where the claim is that the prisoner's confession is the product of coercion we are bound to make our own examination of the record"); *Norris v Alabama,* 294 US 587; 55 S Ct 579; 79 L Ed 1074 (1935) (appellate courts have the duty to analyze the facts to safeguard constitutional rights where the facts and conclusions of law are intermingled); *Ng Fung Ho v White,* 259 US 276; 42 S Ct 492; 66 L Ed 938 (1922) (sanctioning constitutional fact review of a challenge to an administrative deportation warrant).

[20] We realize that the *Harte-Hanks* Court construed the requirement for an independent review more narrowly than *Bose.* This different emphasis formed the basis for disagreement between Chief Justice CAVANAGH and the majority in *Locricchio.* Chief Justice CAVANAGH contended that falsity involves "a classic issue of pure historical fact," while actual malice, like the voluntariness of a confession, involves a mixed fact/law question. Chief Justice CAVANAGH there urged this Court to reject mandatory independent review of such pure historical facts in favor of applying a sufficiency-of-the evidence standard that construes the evidence in the light most favorable to the verdict. *Locricchio* at 136 (CAVANAGH, C.J., concurring in the result).

At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question. Where, for example, as with proof of actual malice in First Amendment libel cases, the relevant legal principle can be given meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law.

The *Miller* Court at 114, cited with approval Monaghan's article discussing *Constitutional fact review,* 85 Colum L R 229 (1985). The author placed the *Bose* case within the context of numerous United States Supreme Court decisions establishing that "absent limiting legislation, federal appellate courts, particularly the Supreme Court" possess the authority to "sort out the relevant facts and apply to them the controlling constitutional norms." Monaghan at 238. Monaghan explained that independent review enabled the appellate court to "elaborate the governing norm." *Id.* at 236. Since law application is "situation-specific" and norm elaboration is often invisible or buried in a general verdict, Monaghan noted that unless appellate courts conduct independent review they are unable to carry out their law declaration function by providing general norm elaboration when they conclude that it is necessary.[21] In accord with Monaghan's view, the *Miller* Court

[21] Monaghan suggests that although it is clear that appellate courts have the authority to conduct independent review, it is not clear that they have the duty to do so. He argues that the judicial role in

emphasized the question of allocation of decision making embodied in the categorization of issues as fact/law or mixed fact/law questions.

We perceive an additional need for independent review grounded on the fear that juries may give short shrift to important First Amendment rights. The *Miller* Court recalled that the Court has tended to allocate decision making to appellate courts where necessary to avoid perceived shortcomings of the trier of fact and to allocate decision making to trial courts where the issue involves the credibility of witnesses. In the area of libel actions, we have acknowledged that independent review "reflects an inherent distrust of allocating unlimited decisional power to juries in the First Amendment context." *Locricchio, supra* at 114, n 20. Even Justice Rehnquist, who dissented in *Bose, supra,* conceded that the doctrine of independent review of facts "exists . . . so that perceived shortcomings of the trier of fact by way of bias or some other factor may be compensated for." 466 US at 518.

We therefore independently review the whole record in this case to consider whether material falsity was shown.

IV

The common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail. For example, the Restatement of Torts provides that "[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in

preserving constitutional rights requires courts to "expound and refine the applicable constitutional law" and elaborate the constitutional norms when necessary. Monaghan at 268.

substance."[22] Michigan courts have traditionally followed this approach.[23] At early common law, Michigan courts predicated a claim for libel on the question whether the article was substantially true. In *McAllister v Detroit Free Press Co,* 85 Mich 453, 460-461; 48 NW 612 (1891), this Court explained that liability could not be imposed for a slight inaccuracy:

> It is sufficient for the defendant to justify so much of the defamatory matter as constitutes the sting of the charge, and it is unnecessary to repeat and justify every word of the alleged defamatory matter, so long as the substance of the libelous charge be justified. . . . [A] slight inaccuracy in one of its details will not prevent the defendant's succeeding, providing the inaccuracy in no way alters the complexion of the affair, and would have no different effect on the reader than that which the literal truth would produce . . . .

Thus, the test looked to the sting of the article to determine its effect on the reader; if the literal truth produced the same effect, minor differences were deemed immaterial.

In contrast to the early common law, where falsity was presumed and the defendant was required to prove substantial truth as a defense, the burden of proving falsity has now been shifted to the plaintiff.[24] Despite this constitutionally required alteration in the allocation of the burden of proof, the definition of falsity remains based on the common-law doctrine. *Masson v New Yorker Magazine, Inc,* 501 US —; 111 S Ct 2419; 115 L Ed

[22] 3 Restatement Torts, 2d, § 581A, comment f, p 237.

[23] See, e.g., *Hay v Reid,* 85 Mich 296; 48 NW 507 (1891); *McAllister v Detroit Free Press Co,* 85 Mich 453; 48 NW 612 (1891); *McGuire v Vaughan,* 106 Mich 280; 64 NW 44 (1895); *Sanders v Evening News Ass'n,* 313 Mich 334; 21 NW2d 152 (1946).

[24] See *Philadelphia Newspapers, Inc v Hepps, supra.*

2d 447 (1991). In determining the falsity compo-
nent of an actual malice finding, the United States
Supreme Court grounded the concept of falsity on
its historical definition of falsity in common-law
libel. *Masson,* 111 S Ct 2432-2433. The Court ex-
plained:

> The common law of libel takes but one approach
> to the question of falsity, regardless of the form of
> the communication. . . . It overlooks minor inac-
> curacies and concentrates upon substantial
> truth. . . . The essence of that inquiry, however,
> remains the same whether the burden rests upon
> plaintiff or defendant. Minor inaccuracies do not
> amount to falsity so long as "the substance, the
> gist, the sting, of the libelous charge be
> justified." . . . Put another way, the statement is
> not considered false unless it "would have a differ-
> ent effect on the mind of the reader from that
> which the pleaded truth would have produced."

Although *Masson* pertained to the falsity compo-
nent of an actual malice determination, it is clear
that the constitutional requirement for testing
falsity mirrors Michigan's common-law test.

The substantial truth doctrine is frequently in-
voked to solve two recurring problems: minor in-
accuracies and technically incorrect or flawed use
of legal terminology. This case raises both ques-
tions. The Court of Appeals held that "whether
the article is read for its gist or simply for the
information presented as fact, plaintiff has met his
burden of proving falsity." 184 Mich App 32. In
reaching this result, the Court of Appeals focused
on the assertions that the article indicated that
plaintiff was "charged" with the crime of first-
degree criminal sexual conduct, sexual assault,
that "charges" had been authorized by the pros-
ecutor when no formal arraignment had occurred,

and that the article suggested that "his children" identified him as the person who committed the crime when the identification was made by his former wife's children. We disagree.

In order to properly evaluate the falsity of the article, we have reproduced the language from the article as published in the newspaper followed by a version that contains language which corrects the inaccuracies complained of by the plaintiff.

This is the text of the report and headline published by the Enquirer & News of Battle Creek:

POLICE ARREST SUSPECT IN BABY-SITTER ASSAULT

A 43-year-old man has been *arrested and charged* with the sexual assault of a 17-year-old wom[a]n who was baby-sitting with *his children* at his *ex-wife's house* on North Finlay Avenue in Bedford Township.

The suspect has been identified by Bedford Township police as David J. Rouch of 631 Golden Ave. He is free on a $10,000 personal recognizance interim bond pending his arraignment in District 10 Court next week. Rouch *is charged with* first-degree criminal sexual conduct.

Police said Rouch allegedly entered the house about 4 A.M. Friday and attacked the young woman. He is said to have used a knife to cut the victim's clothes off, police said.

The victim later called a relative, who took her to Community Hospital and then called police. The suspect was *identified by his children,* according to police.

Rouch was arrested at his home by Emmett Township police, who were informed where he lived by Bedford Township investigators.

The *charge* against Rouch *was authorized Friday by the Calhoun County Prosecutor's Office.* [Emphasis added.]

The following version substitutes language that

the plaintiff asserts should have been used in the article:

POLICE ARREST SUSPECT IN BABY-SITTER ASSAULT

A 43-year-old man has been *arrested and accused* of sexual assaulting a 17-year-old woman who was babysitting his *ex-wife's children* at her house on North Finlay Avenue in Bedford Township.

The suspect has been identified by Bedford Township police as David J. Rouch of 631 Golden Avenue. He is free on a $10,000 personal recognizance interim bond pending his arraignment in District 10 Court next week. Rouch *is accused of* committing first-degree criminal sexual conduct.

Police said that Rouch allegedly entered the house about 4 A.M. Friday and attacked the young woman. He is said to have used a knife to cut the victim's clothes off, police said.

The victim later called a relative, who took her to Community Hospital and then called police. The suspect was identified by *his ex-wife's children,* according to police.

Rouch was arrested at his home by Emmett Township police, who were informed where he lived by Bedford Township investigators.

The Calhoun County Prosecutor's Office *authorized the incarceration* of Rouch on *allegations of criminal sexual conduct* in the first degree.

We cannot agree that the gist or sting of the article is changed by these minor differences.

The primary criticism that plaintiff raises is with the use of the word "charges," absent formal arraignment. The Court of Appeals concluded that the message conveyed to readers of the article by the several references to "charge" or "charges" was materially false. First, it interpreted this Court's opinion in *Rouch I* as requiring this result. It apparently concluded from the statement in

*Rouch I* that "plaintiff was never formally charged" with the crime, that the use of the word "charged" was false. Second, it relied upon a textual analysis of the plain meaning of the word "charge," questioning the defendant's suggestion that "charge" is synonymous with "accuse." Conceding that *Webster's New World Dictionary of the American Language, Second College Edition* (1984), includes "accuse" as one of the possible meanings of "charge," the Court pointed out the additional listed term "indictment." It also referred to *The Random House College Dictionary, Revised Edition* (1984), which defined "charge" as "to accuse formally or explicitly" and as "an accusation." On the basis of these authorities, the Court reasoned that "charge" carries a more serious connotation than "accuse" and that the article's use of the term "in a much more specific and legal sense" was false. 184 Mich App 34. Finally, the Court of Appeals attempted to draw an analogy with this Court's reasoning regarding the distinction between "proceedings" under the privilege statute and mere apprehensions.

We cannot agree with this reasoning. The linchpin of the Court of Appeals analysis is a formalistic interpretation of the word "charge" that belies any attempt to ascertain the "gist" or "sting" of the article to the lay reader. The United States Supreme Court has cautioned that recovery can be refused for "choice of language which, though perhaps reflecting a misconception, represented 'the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies.'" *Masson,* 111 S Ct 2434, quoting *Bose,* 466 US 513.[25]

---

[25] The precise meaning and choice of words employed is a critical factor in any evaluation of the falsity. We are mindful of the inherent imprecision of language and the difficulties this poses to any evalua-

Technical inaccuracies in legal terminology employed by nonlawyers such as those at issue here fall within this category. Numerous courts have rejected claims of falsity when based on a misuse of formal legal terminology.[26] We have recognized that the popular sense of a term may not be technically accurate. See, e.g., *Bailey v Kalamazoo Publishing Co,* 40 Mich 251, 255-256 (1879). The Court reasoned:

A prosecution before a justice is not in a technical sense an indictment, but it serves a similar purpose. Grand juries are seldom summoned now, and very few cases are tried at the circuit on indictment. Informations have generally superseded the old method. Yet we use the term "indictment" in ordinary conversation and often in judi-

tion of the truth or falsity of an article, particularly one that rests upon the use of a word with ambiguous implications. See, generally, Schauer, *Language, truth, and the First Amendment: An essay in memory of Harry Canter,* 64 Va L R 263, 268 (1978). Schauer contends that "the choice of language may be as much a part of the freedom protected by the first amendment as is the choice of the underlying propositions which that language expresses." To ensure the requisite "breathing space" for free and robust debate on matters of public concern, we think it important to allow for imprecision and ambiguity in the choice of language.

[26] See, e.g., *Vachet v Central Newspapers, Inc,* 816 F2d 313, 316 (CA 7, 1987) (the gist of the article concerned the plaintiff's association with a suspected rapist because he was arrested for harboring a fugitive, but the "particulars of the arrest—whether it was pursuant to an arrest warrant or authorized by a state statute—are inoffensive details of secondary importance"); *Simonson v United Press Int'l, Inc,* 654 F2d 478 (CA 7, 1981) (use of the technical term "ruled" for remarks made by the judge during a sentencing hearing and of "rape" where the defendant had pleaded no contest to a charge of second-degree sexual assault was not enough to establish falsity); *Lambert v Providence Journal Co,* 508 F2d 656 (CA 1, 1975), cert den 423 US 828 (1975) (the use of the term "murder" where the defendant denied guilt did not constitute an actionable innuendo regarding his guilt despite the article's failure to use a more neutral term like "homicide" or "shooting death"); *Piracci v Hearst Corp,* 263 F Supp 511 (D Md, 1966), aff'd 371 F2d 1016 (CA 4, 1967) (per curiam) (a newspaper report that the plaintiff was arrested for "possession of marijuana" was substantially accurate despite the fact that the actual charge was "delinquency due to the act of possessing marijuana").

cial opinions to express any criminal prosecution. The burden of this charge was that Bailey had been prosecuted for malfeasance, and we do not think there was any substantial variance between the charge and proof. The popular sense was made out by showing the prosecution for misconduct.

Thus, if technical and common parlance yield different interpretations of the same word, the constitutionally required breathing space affords protection of the writer's choice.

Another typical example involved reports of statements made by a trial judge at a sentencing hearing of a defendant who had pleaded no contest to a charge of second-degree sexual assault. *Simonson v United Press Int'l, Inc,* 654 F2d 478, 479-480 (CA 7, 1981). The article had set forth the judge's comment regarding a "sexually permissive" community and questioning whether a severe sentence should be imposed on "an impressionable person 15 or 16 years of age," who responded. The plaintiff, the trial judge, was recalled from office after the report. He sued the newspaper for defamation, contending that its description of a sexual assault as "rape" and its use of the word "ruled" when describing the judge's comments constituted defamation. The *Simonson* court rejected this argument, noting that rape in its common usage included nonconsensual sex and that intercourse had occurred without the consent of the victim. The court further rejected the judge's contention that he never "ruled" that sexual assault was a "normal reaction to prevalent sexual permissiveness," but simply remarked on this during the hearing. Noting that a plain and ordinary meaning of "ruling" might include statements and comments made by a judge when sitting on the bench, the court rejected the judge's contention that his

"rhetorical question" should not be seen as a ruling. *Id.* at 482.

Just as the judge in *Simonson* asserted that "ruling" should be reserved for words uttered by the judge as a formal decree and that "rape" should not be used for a no-contest plea to second-degree sexual assault, plaintiff asserts that "charge" should be limited to circumstances in which a formal arraignment has been held. As in *Simonson,* the word at issue in this case encompasses the formal legal sense as well as a broader lay sense. Just as the *Simonson* court concluded that use of a word in accord with one of its meanings could not be deemed materially false, so too do we conclude that use of "charge" absent formal arraignment cannot be deemed materially false.

Not only does "charge" in a popular sense accord with the newspaper's use of the term, it accords with the legal description of the status of an arrestee before judicial process is issued. For example, the Legislature used "charge" to describe the disposition of a person following arrest without a warrant. See MCL 764.13; MSA 28.871(1).[27] Similarly, Michigan Court Rules use "charge" to mean accuse. See MCR 6.106(E)(8).[28] Panels of the Court of Appeals and this Court's Criminal Jury Instructions likewise use "charged" as a synonym for

[27] The statute provides:

A peace officer who has arrested a person for an offense without a warrant shall without unnecessary delay take the person arrested before a magistrate of the judicial district in which the offense is *charged* to have been committed, and shall present to the magistrate a complaint stating the *charge* against the person arrested. [Emphasis added.]

[28] The rule provides that the court shall consider "the nature of the offense presently *charged* and the apparent probability of conviction" (emphasis added) along with other factors when deciding whether a person is entitled to release on personal recognizance, conditional release, or release on money bail.

accusations made by the police in conjunction with arrests made without a warrant.[29] Thus, the popular and legal sense of the term "charge" may not be identical before the police act on an accusation; once the police act on an accusation, the popular and legal terms are synonymous.

Furthermore, both testimony and documents from the trial illustrate the numerous uses to which the word can be put. Plaintiff himself used "charge" at numerous points in the proceedings to describe the accusations brought against him.[30] Furthermore, plaintiff conceded that "the article in question and its reference to the Plaintiff being arrested and being charged [with] CSC and thereafter released on bond were true."[31] In addition, the police reports used "charge" to describe the accusations against Rouch.[32]

The word "charge" is an umbrella term covering all stages of the charging process. It is used by the

[29] See, e.g., *People v Suchodolski*, 22 Mich App 389, 394-395; 178 NW2d 524 (1970). See also Michigan Criminal Jury Instructions (2d ed), § 3.5(4) (the "fact that the defendant is charged with a crime . . . is not evidence").

[30] Plaintiff testified that a police officer told him that he "was getting picked up on a sexual charge or something." He also stated that he asked "what the charge was" and was told "it was a sexual assault on a child." He further commented that he was told "that, you know, the charge that they—that I was being charged with." When asked when he understood that he was arrested and charged, plaintiff explained that he was told that "we're charging you with this, and that's what they said."

[31] After trial, plaintiff apparently sought to shift the emphasis of his claim to the question whether, in publishing an account of his arrest, the article suggested that he had actually committed the crime, rather than that the reporting of his arrest and subsequent release on bond included materially false details. The trial court considered this broader argument, but ultimately based its ruling on the narrower ground that the details in the article were materially false.

[32] The Bedford Township police report stated that the "Bedford Township Police Department wanted Mr. Rouch picked up on this charge." The 10th District Court Bail Bond form also stated that Rouch had secured his release "from custody pending final disposition of the charge or charges."

law in contradistinction to a conviction. Even if plaintiff's argument that "charge" connotes a more serious formal involvement of judicial process than "accuse" were correct as a matter of law, we think it apparent that the word may be used in a popular sense as a synonym for accuse. While one meaning of "charge" is simply "accuse," carrying with it no intimation of governmental involvement, here, if the word "charge" is measured by the gist of what happened, there was not only a charge or accusation by an individual, but a booking by the police, an authorization by the prosecution to lodge the suspect on the charge, and an involvement by the magistrate recognizing these actions. Thus, even if "charge" connotes the existence of governmental involvement, that was present here.[33]

At best, one might conclude that the use of "charge" in its technical formal sense was inaccurate. We cannot accept this as a basis for liability. To do so would totally eviscerate the "breathing space" that the constitution requires in order to protect important First Amendment rights. When writing about criminal justice or legal matters, newspapers would be forced to recapitulate technical legal terminology employed by courts or law enforcement personnel even where popular words might be clearer for the lay reader. Attempting to reframe legal documents and events with legal significance into popular or lay terminology would be fraught with peril, and newspapers would do so at their risk. As one court remarked, there is "no

[33] All the elements necessary to obtain a formal warrant were present. The only thing lacking was the officer's appearance before the magistrate to swear to what was in the complaint. In 1 Criminal Procedure, § 1.4, p 21, LaFave and Israel state that in "most jurisdictions, the post-arrest issuance of a warrant is viewed as an unnecessary formality, and the magistrate's finding of probable cause will combine with the complaint to authorize continuing custody."

authority for plaintiff's contention that a newspaper article reporting a judicial proceeding must indicate every possible interpretation of every word used in a complaint or other legal document."[34] We agree. Having conducted an independent review of the record to determine whether use of the word "charge" rendered the article materially false, we conclude that it did not.

Plaintiff's additional complaint falls within the second category of cases arising under the substantial truth doctrine, those that involve minor inaccuracies. Plaintiff protests the article's suggestion that he was identified by his children, rather than the children of his former wife. The Court of Appeals concluded that this constituted material falsity because it seemed to eliminate the possibility that there was a mistaken identification. We cannot accept this reasoning.

Numerous courts have considered the falsity of articles in which the gist of the story was accurate, but minor inaccuracies marred the report. *Drury v Feeney*, 505 So 2d 111 (La App, 1987), cert den 506 So 2d 1225 (1987), is illustrative. Despite the defendant's failure to report precisely the nature of the plaintiff's conviction, the court found that the article was substantially true. The article described the plaintiff's conviction of "21 counts of mail fraud to cheat insurance companies and his clients of money in car accident suits." Actually, the plaintiff had been convicted for failure to disclose to his clients a fee-splitting arrangement. In colorful language, the court concluded

---

[34] *Handelsman v San Francisco Chronicle,* 11 Cal App 3d 381, 387; 90 Cal Rptr 188 (1970) (ruling that use of the criminal term "theft" was not substantially untrue despite the fact that the complaint involved a civil action for conversion). See also *Hopkins v Keith,* 348 So 2d 999, 1002 (La App, 1977), writ not considered 350 So 2d 893 (La, 1977) (an article that reported that the plaintiff had been convicted for "running a gambling game" when he had merely forfeited bond on the charge was substantially true).

that the discrepancy was " 'an infinitesimal aberrant grain of sand hidden in an entire seashore of reprehensible conduct and truths . . . .' " 505 So 2d 112.[35]

Like courts in other jurisdictions, Michigan courts have found substantial truth despite minor inaccuracies in the details of an article. *McCracken v Evening News Ass'n,* 3 Mich App 32; 141 NW2d 694 (1966), epitomizes the reasoning that undergirds such a finding. The defendant newspaper reported that the plaintiff was charged with "$100,000 fraud" when, in fact, he had altered construction invoices in an amount between $37,000 and $39,000. The Court of Appeals rejected the plaintiff's claim that the article was substantially untrue, noting that this constituted "an inaccuracy that does not alter the complexion of the affair and would have no different effect on the reader than that which the literal truth would produce." 3 Mich App 40.[36]

The essence of plaintiff's argument is that the statement in the article that his children had identified him would eliminate in the reader's mind the possibility of a mistake. We think the gist or sting of the article was that plaintiff was arrested on the basis of the identification of per-

[35] See also *Stevens v Independent Newspapers Inc,* 15 Media L Rptr 1097 (Del Super Ct, 1988) (a newspaper inaccurately reported that the plaintiff had used a state car to drive seventy-two miles to work when in fact the distance was only fifty-five miles); *Brueggemeyer v Associated Press,* 609 F2d 825 (CA 5, 1980) (news reports that the court ordered restitution might equal $700,000 were substantially accurate despite the fact that the case involved only 1400 customers with a right to press claims involving purchases that averaged only $500); *Gomba v McLaughlin,* 180 Colo 232; 504 P2d 337 (1972) (a newspaper account that accurately reported that the plaintiff assaulted an elderly gentleman, but misstated the geographic location where the assault occurred, was substantially true).

[36] See also *Shutt v Harte-Hanks Communications, Inc,* 7 Media L Rptr 2559 (ED Mich, 1981) (a headline inaccurately reported that during a blackout the plaintiff had used the city's generator to light his home, but in fact he had used it to power his home freezer).

sons who knew him. While we might agree that a reader acquainted with the facts might have more reason to suspect the motives of the identifiers, this is an argument regarding the weight of the identification, not its truth or falsity.

In sum, neither of the asserted errors, taken individually or as a group, alters the gist or sting of the article. The sting of the article was that the plaintiff had been identified by persons to whom he was well known and was charged with CSC I. That is true. The question whether a formal warrant had been issued or an arraignment held, like the question whether it was his children or former stepchildren who identified him, did not affect the article's substantial truth. Thus, the Court of Appeals erred in affirming the trial court judgment on this issue.

V

After painstaking review of the whole record in light of Michigan libel law and the latest constitutional pronouncements on the subject, we conclude that the evidence was not sufficient to establish material falsity.

Accordingly, because we disagree with the reasoning and result of the Court of Appeals, we vacate its opinion and remand this matter to the trial court for entry of judgment in favor of the defendant.

BRICKLEY, GRIFFIN, and MALLETT, JJ., concurred with BOYLE, J.

RILEY, J. (*concurring*). Although I agree essentially with the opinion of the majority, I write separately to make the following observations.

I concur in the result reached by the majority

that this Court has a constitutional duty to independently evaluate the evidence in defamation cases and that, in this case, plaintiff failed to establish material falsity. I also agree with the majority that the decision of the Court of Appeals must be vacated. However, as a threshold matter, I suggest that plaintiff's failure to allege and identify in his pleading, supplemental pleading, and answers to defendant's interrogatories, specifically which statements he considered to be materially false and how the newspaper either was negligent or reckless in publishing the story, were proper grounds for summary judgment by the trial court.

I

In *Locricchio v Evening News Ass'n,* 438 Mich 84, 115-116; 476 NW2d 112 (1991), we reviewed our common-law precedent[1] and listed the four components required to state a cause of action for libel: (1) a false and defamatory statement of and concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. We also stated that a cause of action for libel requires a plaintiff to show defamatory meaning as well as falsity, fault, and publication. *Locricchio, supra* at 116. Inherent in these requirements is the well-established rule that a defamation plaintiff must plead with specificity who published the defamatory statement, when it was published, and, most importantly, a plaintiff must identify the precise materially false statement published. *MacGriff v Van Antwerp,* 327 Mich 200, 204-205; 41 NW2d 524 (1950). In *Mac-*

---

[1] *Nuyen v Slater,* 372 Mich 654, 662, n *; 127 NW2d 369 (1964).

*Griff,* we held that the plaintiff's failure to directly identify the defamatory statements entitled the defendant to summary judgment. *Id.* at 204. In subsequent cases, the Court of Appeals routinely followed this rule by affirming trial court rulings that granted summary judgment to defamation defendants.[2]

In recent years, however, a conflict developed in the Court of Appeals over whether a general allegation of malice is sufficient to establish a genuine issue of material fact. The conflict began with *Parks v Johnson,* 84 Mich App 162, 169; 269 NW2d 514 (1978), wherein a Court of Appeals panel held that because courts are liberal in finding the existence of a genuine issue of material fact, they should not grant summary judgment unless convinced that the claim cannot be supported at trial. The *Parks* rationale was disapproved, however, in *Hayes v Booth Newspapers, Inc,* 97 Mich App 758, 774-775; 295 NW2d 858 (1980); *Lins v Evening News Ass'n,* 129 Mich App 419, 435; 342 NW2d 573 (1983); *Dienes v Associated Newspapers, Inc,* 137 Mich App 272, 283; 358 NW2d 562 (1984); and again in *Kurz v Evening News Ass'n,* 144 Mich App 205, 213; 375 NW2d

---

[2] *De Guvera v Sure Fit Products,* 14 Mich App 201, 206; 165 NW2d 418 (1968) (" '[t]he law requires the very words of the libel to be set out in the declaration in order that the court or judge may judge whether they constitute a ground of action' "); *Pursell v Wolverine-Pentronix, Inc,* 44 Mich App 416, 421; 205 NW2d 504 (1973) (applying the *De Guvera-MacGriff* rule to slander actions); *Hernden v Consumers Power Co,* 72 Mich App 349, 356; 249 NW2d 419 (1976) (a plaintiff's failure to allege "where, when, or to whom this statement [publication that the plaintiff was fired for lack of productivity] was published, or that there even was a publication to anyone other than the plaintiff himself"); *Ledl v Quik Pik Food Stores, Inc,* 133 Mich App 583, 589-590; 349 NW2d 529 (1984) (referring to *Hernden* and *Pursell* with approval, the *Ledl* Court held that the failure of a plaintiff to set forth with specificity the necessary elements of a defamation cause of action: the defamatory words complained of, the connection of the defamatory words with the plaintiff, and the publication of the alleged defamatory words, entitled the defendant to summary judgment).

391 (1985), vacated on other grounds 428 Mich 886; 403 NW2d 805 (1987). These panels of the Court of Appeals concluded that a plaintiff must plead specific facts in support of showing actual malice to defeat a motion for summary judgment. The issue was settled until yet another panel held that *Parks* was correct; malice can be generally alleged and plaintiff should be given ample opportunity to demonstrate actual malice. *Grostick v Ellsworth,* 158 Mich App 18, 23; 404 NW2d 685 (1987). The *Grostick* decision was abandoned shortly thereafter in *Smith v Fergan,* 181 Mich App 594, 597; 450 NW2d 3 (1989). The *Smith* Court reaffirmed the principle that because the issue of actual malice is one for the jury, specific supporting facts must be alleged and general allegations of malice are, therefore, insufficient to establish a genuine issue of material fact. The *Smith* decision is now controlling authority, and under Administrative Order Nos. 1990-6, 1991-11, binding precedent. See *Gonyea v Motor Parts Federal Credit Union,* 192 Mich App 74, 80; 480 NW2d 297 (1991); *Prysak v R L Polk Co,* 193 Mich App 1, 14; 483 NW2d 629 (1992).

In a similar vain, MCR 2.111(B)(1), and its predecessor GCR 1963, 111.1(1) requires plaintiffs to state in their pleadings "[a] *statement of the facts,* without repetition, *on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims* the adverse party is called on to defend" (emphasis added). Failure to identify a false statement should result in summary disposition in favor of the defendant pursuant to MCR 2.116(C)(8).

II

In the instant case, plaintiff, deemed a private

person implicated in a matter of public concern,[3]
filed his complaint dated December 2, 1980, alleg-
ing that defendant defamed him by stating that he
was arrested, charged, and released on $10,000
personal recognizance bond for sexually assaulting
the baby-sitter of his children.[4] Shortly thereafter,
defendant sent plaintiff a set of interrogatories
requesting him to "[s]et forth separately each
statement of fact in the article which Plaintiff
alleges was false, separately quoting each alleged
false statement of fact," and then to "describe the
exact nature and extent of the alleged falsity." In
his answers, plaintiff apparently understood this to
mean that the issue of falsity went to the question
whether he committed the assault, which he did
not, and because he had not, the article was ma-
terially false.

Upon receiving the answers, defendant for-

[3] *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157, 204; 398
NW2d 245 (1986).

[4] Plaintiff's complaint, dated December 2, 1980, alleged the follow-
ing facts.

3. That on or about December 22, 1979, said Defendant
falsely and/or maliciously published an article concerning your
Plaintiff in said newspaper and that the charges made therein
were false and defamatory as follows: that Plaintiff was ar-
rested and charged with the sexual assault of a 17-year old
woman who was babysitting with Plaintiff's children at
Plaintiff's ex-wife's residence; that Plaintiff was free on a
$10,000 personal recognizance bond; that Plaintiff was charged
with first-degree sexual conduct; that Plaintiff attacked said 17-
year old woman and used a knife to cut her clothes off; that
Plaintiff was identified as the person making said assault by his
children.

4. That by said words, Defendant meant and was understood
to mean that Plaintiff was the person who sexually assaulted
and raped a 17-year old woman who was babysitting his chil-
dren.

5. That said publication of said facts as they related to your
Plaintiff were false.

Subsequently, plaintiff amended his complaint on December 19,
1980, alleging the same facts with the identical paragraphs.

warded a supplemental set of interrogatories requesting plaintiff to specifically describe which statement in the article was false. Plaintiff objected to the supplemental interrogatories, arguing that the question "deal[s] with legal principles or at least the application of facts to legal principles which only Plaintiff's attorney is qualified to answer . . . ." Defendant responded with a motion for summary judgment alleging first, that the article is substantially true—because the falsity issue did not relate to whether he committed the assault, but rather to whether the defendant's report of plaintiff's arrest was accurate—and, second, that it is privileged under Michigan's common-law qualified privilege and the official proceedings act, MCL 600.2911(3); MSA 27A.2911(3). Plaintiff also moved for summary judgment alleging that defendant admitted in its affirmative defense that the story was false, and, therefore, the only issue at trial was damages.

Calhoun Circuit Court Judge Stanley Everett denied both motions, but ordered plaintiff to answer defendant's supplemental interrogatories. At this hearing, Judge Everett recognized that plaintiff had failed to plead with specificity the defamatory statements published, how the statements related to him, and what was materially false within the statement. Judge Everett also recognized that the specificity requirement is needed in defamation pleadings, as it is in the ordinary negligence cases, to allow the parties to narrow their focus on the allegedly libelous statements and to determine if the article, taken as a whole, is materially false.[5] Plaintiff's counsel again ar-

---

[5] As he explained:

How is it different, Mr. Jereck, from the ordinary negligence case in which the interrogatory may say, specify what acts on

gued that his client's guilt or innocence of the underlying assault is determinative regarding whether the article is materially false. Defense counsel posited in response that "the Judge put his finger on it when [he] made the analogy to the negligence case. All that [plaintiff's] complaint says is that . . . the publication was made maliciously. Now, under the [Court] Rules, . . . there has to be some showing of falsity and knowledge of falsity, and so on, . . . to make out a case [for] libel . . . ."

Upon receiving plaintiff's answers to the supplemental interrogatories—which stated that the article was false because he did not commit the rape, and that defendant committed various omissions in publishing the story—defendant moved again for summary judgment. Defense counsel argued that "none of those answers state or raise any issue of malice in the sense that is applicable to this libel action."[6] Plaintiff responded by alleging

the part of the defendant you claim were negligent? Now, the term negligence has a special meaning in the law, it is a little more—a little easier probably for the layman to recognize it than malice, as we're using it. But, he could easily say, I don't know what negligence is and, therefore, I can't—what the legal definition of negligence is, therefore, I can't answer your question, and avoid it.

[6] Defense counsel proceeded with the argument:

Malice in this sense—in the State of Michigan, means malice in the sense of the *New York Times v Sullivan* [376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964)]. That test has been reiterated in case after case in our courts; that where a publication is made by a news media of a newsworthy story, the burden is upon the plaintiff to establish that the publication was made with malice, that is, with knowledge of falsity or reckless disregard of falsity. It is our position, Your Honor, that none of the answers to the interrogatories that are on file in any way establish that at the time that the news story was published, that anyone at the newspaper knew that the matter—material was false or had reckless disregard of the falsity.

that the article was not privileged under the official proceedings act, that the article was defamatory because it falsely accused him of a crime he did not commit, and that the paper failed to make an effort to assess the truthfulness of the report.

This time, Judge Everett granted defendant's motion. He based his conclusion on the fact that there was a qualified privilege to publish the story, and that plaintiff failed to specify in his answers to the supplemental interrogatories "any allegation which suggests that the statements were known to be false on the part of the people involved in its publication or with reckless disregard whether they were false or not."[7]

### III

Thus, I write separately to indicate my agreement with the trial court and to emphasize my

It is also important to recognize that defense counsel did not rely on the official proceedings act.

[7] The court concluded with the following thoughts:

Now, many of the things set forth which you read, Mr. Jereck, relate to events after the publication which might very well go to damages and mitigating damages, but the fact as presented to the court at this time is that the reporter contacted the police, was given information, some of which, admittedly, was true; but the important point was false, and that is that there had been an authorization for a warrant charging the defendant with a specific criminal offense of some significance. I don't find anything that suggests there was an actual knowledge of the falsity of the statement or anything to suggest there was reckless disregard of the truthfulness or falsity of the statements. Consequently, I am satisfied—and I am relying on particularly on *Schultz v Newsweek Incorporated* [668 F2d 911 (CA 6, 1982)], which is the most recent decision which has been called to my attention, at least, in this evolving state of law. I am satisfied that (1) there is a qualified privilege, (2) that no suggestion has been made on the part of plaintiff that he can substantiate malice; and, therefore, that the defendant is entitled to have the matter dismissed by way of summary judgment.

belief that although this Court abandoned the
"actual malice" standard for private person-public
interest defamation actions in *Rouch I*[8] and
adopted the "negligence" standard of liability, de-
fendant was, nevertheless, entitled to summary
disposition, as a matter of law, on the basis of our
common-law precedent[9] and our court rules.[10] The
relatively simple requirement of pleading facts to
support allegations of material falsity, negligence,
or reckless disregard for the truth should be fol-
lowed by plaintiffs in defamation actions, and,
pursuant to MCR 2.116(C)(8), defendant should
have been entitled to summary disposition on this
ground alone a decade ago.

GRIFFIN, J., concurred with RILEY, J.

CAVANAGH, C.J. I respectfully dissent. I agree
that the correct legal test is one of material falsity
and that the court is required to conduct an inde-
pendent review of the record. I disagree, however,
with the majority's conclusion that there is insuffi-
cient evidence of material falsity.

I

The disputed article in this case does contain
inaccuracies. The defendant concedes that the
plaintiff was not identified by his own children,
but by his ex-wife's children. In addition, the
article's assertion that the plaintiff was "arrested
and charged" was inaccurate if "charged" is inter-
preted to mean subjected to formal charges. And,
perhaps most significantly, there were never any
charges "authorized by the Calhoun County Pros-

[8] *Rouch,* n 3 *supra.*

[9] *MacGriff, supra* at 204-205.

[10] MCR 2.111(B)(1). See also Niehoff, *The Michigan law of defama-
tion,* 1985 Det C L R 975, 980-982.

ecutor's Office." Under long-established principles
of defamation law, however, the issue is not
merely whether there are inaccuracies but
whether the inaccuracies constitute material fal-
sity.[1] The test is whether the evidence supports the
finding that the article was materially false in
that the "sting" of the article would have a differ-
ent effect upon the mind of the reader than would
the literal truth.

In determining whether the concededly false
aspects of the publication are significant, for defa-
mation purposes, in relation and comparison to
the concededly true portions, the inquiry necessar-
ily goes beyond the strictly factual level and re-
quires interpreting the likely effect of the publica-
tion on the reader's mind, and the likely meaning
conveyed. But as the Court in *Locricchio v Eve-
ning News Ass'n*, 438 Mich 84, 111, n 17; 476

---

[1] The Court of Appeals stated that this Court had rejected the
approach requiring material falsity:

> Our dissenting colleague . . . finds that not only must the
> disputed statements be proven false, they must be false in a
> material aspect. Under this analysis, if the gist, or sting, of the
> article is substantially true, the falsity test is not met. The
> earlier Supreme Court opinion in this case specifically rejected
> this approach: "[W]e decline to distinguish, as did the Court of
> Appeals, the essence of the article from its supporting facts or
> details." 427 Mich 204. [184 Mich App 31-32.]

This Court in its earlier *Rouch* opinion, however, did not even address
the issue of material falsity. The language quoted by the Court of
Appeals is taken out of context. In the quoted passage, this Court was
discussing whether the article constituted speech of public concern,
not whether the falsity must be a material one. Nevertheless, the
Court of Appeals applied the test for material falsity and concluded
that the plaintiff should prevail under either test:

> [W]hether the article is read for its gist or simply for the
> information presented as fact, plaintiff has met his burden of
> proving falsity. [*Id.* at 32.]

Accordingly, this error by the Court of Appeals does not require
reversal.

NW2d 112 (1991), recognized, "in reviewing a libel verdict an appellate court does not and should not exercise review of credibility determinations, disregard previous factfindings, or create new factfindings. Rather, the court should exercise independent judgment regarding whether, as a matter of constitutional law, the evidence in the record supports the verdict." Similarly, the United States Supreme Court has declared:

> Indeed, it is not actually necessary to review the "entire" record to fulfill the function of independent appellate review . . . . The independent review function is not equivalent to a "de novo" review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff. [*Bose Corp v Consumers Union of United States, Inc,* 466 US 485, 514, n 31; 104 S Ct 1949; 80 L Ed 2d 502 (1984).]

The task before this Court, therefore, is to undertake an independent review of the record and make a judgment regarding whether the evidence supports the finding that this article was materially false. While the standard calls for "independent appellate review," and this Court is not constrained to agree with the jury, it is important to recognize that in this case a jury, adequately instructed with respect to the need for material falsity, has reached a conclusion regarding the likely effect of the article at issue on the mind of the average reader.[2] Indeed, when the entire news-

---

[2] The trial court's instructions to the jury included:

Secondly, that statements in the article were false. In deciding whether any statements in the article were false, you must interpret the words according to their ordinary and obvious meaning. You must give the words the fair and reasonable

paper article consists of only ten sentences, and those ten sentences contain six factual inaccuracies, this Court should not lightly overturn the jury's conclusion that the overall effect was materially false.

II

Turning now to a review of the evidence in this case, the Court of Appeals declared that the article was materially false in two respects: (1) by inaccurately stating that the plaintiff had been identified as the assailant by his own children when in fact it was his former stepchildren who had identified him, and (2) by stating several times that plaintiff was arrested *and* charged with sexual assault when he was in fact merely arrested. As a purely factual matter, the statement that the plaintiff's own children had identified him as the assailant was false; the question, however, is whether it was a materially false statement; would it create a different impression in the mind of the reader than would the actual truth? I would conclude that the evidence supports such a finding. A man's children would presumably know him very well by

interpretation that an average reader would give them. You need not look at words used in the article according to any technical or legal definition. Whether the statements in the article were false is for you to decide after considering the statements in the article, in the light of all of the evidence in the case.

Thirdly, the Plaintiff *must prove that false statements in the article were materially false* and tended to harm the Plaintiff's reputation. *That is, that they made the article libelous.* In determining whether an article is libelous, it is necessary to read the article as a whole, and fairly and reasonably construe it *in determining whether the false portions make the article libelous in character.* [Emphasis added.]

Furthermore, the jury was given a special verdict form in which it was asked, in part: "Were the statements materially false, tending to harm the plaintiff's reputation, that is, did they make the article libelous?"

sight, and their reported identification of him would likely be treated by the reader as deserving of exceptional credibility because it "would seem to eliminate the possibility that there might have been a mistaken identification." 184 Mich App 36. In light of the "sting" of the entire article, that there was more involved than a mere apprehension of a suspect, this statement would have had a strong effect on the mind of the reader. This Court previously declared that both the fact of the arrest and "the facts used to establish the probable cause for the arrest" are of public concern. *Rouch I,* 427 Mich 206. Certainly identification by one's own children would affect probable cause for the arrest and, in determining whether the reasons for the arrest were materially false, the misidentification of the stepchildren as children is not inconsequential. Even if this question is seen as a close one, I cannot conclude that the reader would not have a different reaction than if the literal truth had been reported. Therefore, the jury's determination should stand.

The second aspect of falsity flows from the declaration that the plaintiff was "charged" with criminal sexual conduct. As a legal matter, it was inaccurate to state that the plaintiff had been "charged." In fact, no warrant had been issued by the prosecutor, the plaintiff had not been arraigned, and there had been no judicial determination of probable cause; the plaintiff was merely arrested and booked on suspicion of the crime.

As a preliminary matter, the dissenting judge on the Court of Appeals is correct in maintaining that "newspapers should not be held to technical legal language. Instead, they should be held to the use of words as they are customarily and popularly used." 184 Mich App 53 (opinion of ALLEN, J.). But even in light of common, colloquial usage by non-

lawyers and the general public, when the article declared that the prosecutor had authorized the charge, the allegations became one of formal charges, not merely suspicion.[3] The effect on the mind of the reader was materially different from the effect that would have resulted from the actual truth. Indeed, the last sentence of the article strongly suggests that the term "charged" was being employed in the formal sense; the article claimed that "[t]he charge against Rouch was authorized Friday by the Calhoun County Prosecutor's Office." Within this context the term "charge" would normally be interpreted to mean formal charges. Since no formal charges were ever pursued, this could properly have been considered by the jury to constitute a material falsity.

A final note in this area is that I believe it is inappropriate for the majority to focus merely on the definition of the single word "charge." *Ante,* p 263.[4] Michigan's law of libel requires an examina-

---

[3] The Court of Appeals eloquently summed up the evidence on this point:

> The plain language *and* clear implication of the *Enquirer* article are that there was more than a simple accusation against plaintiff. The article says twice that plaintiff was charged with a sex crime, and the final paragraph says that the prosecutor's office authorized the charge. The prosecutor, as is *commonly known* and as noted by the trial judge, does not just accuse; the prosecutor authorizes formal criminal proceedings, and that is exactly what the article says happened. There can be no doubt that both the details as reported and the gist of the article say that plaintiff was formally charged with a serious crime, not that there was merely an accusation of wrongdoing. [184 Mich App 34-35. First emphasis in original, second emphasis added.]

[4] The Court of Appeals also rejected the argument based on the definition of the word "charge" considered in isolation:

> The dissent in this case says that the common usage of the word "charge" means "accuse" and that plaintiff was accused of the assault and so the article was not false. There are

tion of the article as a whole. See *Gustin v Evening Press Co,* 172 Mich 311, 314; 137 NW 674 (1912) ("To test its libelous quality, a publication must be considered as a whole . . ."); *O'Connor v Sill,* 60 Mich 175, 181; 27 NW 13; 28 NW 162 (1886) ("The article . . . must all be read together. Parts of it cannot be severed . . ."). Read as a whole, the article conveyed the impression that there was overwhelming evidence and that judicial proceedings had been instituted against Rouch. The effect of this on the mind of the reader is different from that of a mere "apprehension." *Rouch I,* 427 Mich 172. The "sting" that results from this impression of formal charges created a substantially different effect on the mind of the reader. The evidence demonstrated, and the jury obviously found, that the article as a whole conveyed an impression quite different from that which the actual truth would have produced.

I would affirm the judgment of the Court of Appeals.

LEVIN, J., concurred with CAVANAGH, C.J.

LEVIN, J. (*separate opinion*). I have signed the Chief Justice's opinion.

---

problems with this line of reasoning. . . . [W]e do not agree that the commonly understood meaning of the word "charge" is merely to accuse. *Webster's New World Dictionary of the American Language, Second College Edition* (1984), includes "accuse" in its definition of "charge," but it also includes the term "indictment," a word of far more serious import and implications. Indeed, "indictment" implies a formal *criminal* accusation. . . .

Even if we were to accept the proposition that the common usage of the term "charge" relates only to an accusation, the article, as written, and particularly the last paragraph, certainly uses the term in a much more specific and legal sense. [*Id.* at 33-34.]

I

While I fully agree with the Chief Justice that "it is inappropriate for the majority to focus merely on the definition of the single word 'charge,' "[1] I would be inclined to conclude that it is not defamatory in itself to describe an arrest as a "charge"—to say that a person who has been arrested has been charged, rather than to say that he has been arrested.

The news article here in question, however, said more. The article said that Rouch had been "arrested and charged," and that "[t]he charge against Rouch was authorized Friday by the Calhoun County Prosecutor's Office."

Arrests are often made by police officers without prior authorization from the prosecutor. The import therefore of a news article describing an arrest merely as a "charge" is significantly different than the import of an article stating that a person has been "arrested and charged" and that the "charge" "was authorized" by the prosecutor. In stating that Rouch had been arrested and charged, and that the charge was authorized by the prosecutor, the news article implied that the governmental official responsible for the administration of justice had concluded that Rouch should be arrested and charged. This suggests more than an ordinary arrest by a police officer.

The majority dwells at length on the meaning of "charge." The sentence stating that the charge "was authorized" by the prosecutor significantly changed the import and sting of the article. As stated by the Chief Justice, the article read as a whole conveyed "the impression that there was

[1] *Ante,* p 284.

overwhelming evidence and that judicial proceedings had been instituted against Rouch."[2]

Rouch was arrested and detained at 5:25 A.M. by police officers without prior authorization by the prosecutor. After Rouch arrived at the station house, a police officer telephoned an assistant prosecutor who authorized the officer to further detain Rouch.[3] The prosecutor had not, and did not later authorize the filing of a "charge." That afternoon, Rouch was taken before a magistrate and released from custody.

A reasonable factfinder could conclude that the statements in the news article, that Rouch had been "arrested and charged" with first-degree criminal sexual conduct and that the "charge against Rouch was authorized" by the prosecutor, implied[4] falsely that a prosecutor had authorized the police to arrest Rouch on charges of CSC-1.

II

The concurring opinion overlooks the distinction between stating a cause of action and providing a "statement of the facts, without repetition, on which the pleader relies in *stating the cause of action*."[5]

A motion of the Enquirer and News of Battle Creek seeking summary disposition on the ground that Rouch had "failed to state a claim on which

---

[2] *Id.,* p 285.

[3] The police report states that the assistant prosecutor "was briefed on the complaint and the *circumstances surrounding the arrest of suspect.* He advised to lodge the suspect on CSC1ST." (Emphasis added.)

[4]   The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. [*Milkovich v Lorain Journal Co,* 497 US 1, 21; 110 S Ct 2695; 111 L Ed 2d 1 (1990).]

[5] MCR 2.111(B)(1). (Emphasis added.)

relief can be granted"[6] could not properly be granted because of any failure in the complaint filed by Rouch adequately to state the facts on which he relied in seeking to state a cause of action.

A claim that a pleader has failed adequately to state facts may be raised at the trial level by a motion to correct or strike pleadings pursuant to MCR 2.115. If the motion is granted, the pleader

---

[6] MCR 2.116(C)(8).

The actual motion for summary disposition filed by the Enquirer and News reads as follows:

Now Comes Defendant Enquirer & News of Battle Creek, Michigan, a Delaware corporation, through its attorneys, Sullivan, Hamilton, Ryan & Schulz and moves the Court that an Order be entered granting a summary judgment of no cause for action in favor of Defendant and against Plaintiff in this case. This Motion is the renewal of a Motion previously filed in this action and the statements contained in the original Motion are herein incorporated by reference as though the same were set forth word for word.

That the hearing on the Motion for Summary Judgment originally filed was held in conjunction with a hearing on a Motion to compel Plaintiff to answer certain interrogatories dealing with Plaintiff's assertion of malice on the part of Defendant.

That the Court denied the Motion for Summary Judgment and at the same time entered an order requiring Plaintiff to answer Defendant's interrogatories.

That Plaintiff has filed answers to interrogatories and the same are part of the files and records of this case.

That said answers to interrogatories do not contain any factual statements or allegations which, if proved, would establish that Defendant published the article with knowledge that it was false or with reckless disregard of whether it was false or not and, therefore, do not raise any issues of fact on the question of malice.

That the article in question is a substantially true report of a matter of general public interest.

That the published information was obtained from police officials, upon whom Defendant had the right to rely.

That the publication is entitled to qualified privilege under the laws of this state and, therefore, in the absence of proof of malice, cannot be the basis for a judgment in an action for libel.

may as of course file an amended pleading more fully stating the facts on which the pleader relies.[7]

The plaintiff's answers to interrogatories fully supported the cause of action stated in the complaint.[8]

---

[7] MCR 2.115 and MCR 2.116(I)(5).

[8] The interrogatories directed to plaintiff read as follows:

Interrogatories Directed to Plaintiff

You are hereby notified that within fifteen (15) days from the time of service upon you, you shall answer separately, fully, in writing and under oath, each and every of the following interrogatories in accordance with the provisions of General Court Rule No. 309, and various subsections thereof.

These interrogatories shall be deemed continuing and supplemental answers thereto shall be required immediately upon receipt thereof, if the Plaintiff directly or indirectly obtains further or different information, from the time the answers are served to the time of trial.

1. Set forth separately each statement of fact in the article which Plaintiff alleges was false, separately quoting each alleged false statement of fact.

2. With respect to each statement of fact set forth in response to Interrogatory No. 1, describe the exact nature and extent of the alleged falsity.

3. Specify whether Plaintiff intends to rely upon a claim of common law malice, as implied by law in favor of Plaintiffs in libel actions, or upon an affirmative claim of actual malice on the part of Defendant in publication of the alleged defamatory statements.

4. If affirmative evidence of actual malice (as opposed to the common malice implied by law in favor of plaintiffs in libel actions) will be introduced at trial of this action, set forth separately and describe fully each item of evidence of fact upon which plaintiff will rely to establish actual malice on the part of Defendant Enquirer & News of Battle Creek.

5. If Plaintiff contends that the false statements of fact in the article were published with reckless disregard on the part of Defendant Enquirer & News of Battle Creek, set forth each item of evidence upon which Plaintiff will rely to establish such reckless disregard.

The answer to interrogatories reads as follows:

Answer to Interrogatories

Now comes the above-named Plaintiff who being first duly sworn deposes and says in answer to Defendant's Interrogatories as follows:

1. a. Plaintiff was taken into custody with regard to an alleged offense, but was never formally charged with any offense.

b. Plaintiff was never charged with the sexual assault of a 17-year-old woman.

c. 17-year-old woman was not babysitting Plaintiff's children.

d. Plaintiff was never formally charged with first-degree sexual conduct.

e. Plaintiff never entered the house at 4:00 A.M. Friday and attacked a young woman.

f. Plaintiff never used a knife to cut victim's clothes off.

g. Plaintiff was not identified by any of his children as being the alleged assailant.

h. No formal charges were authorized by the Calhoun County Prosecuting Attorney's Office.

2. All of the items set forth in Paragraph 1 are false.

3. My attorney advises me that we intend to rely on both the claim of common law malice and an affirmative claim of actual malice.

4. My attorney advises me that he has not completed discovery and, therefore is not able to answer this question at this time.

5. My attorney has not completed his investigation and, therefore, I cannot answer this question at this time.

Plaintiff's answers to defendant's supplemental interrogatories read as follows:

Plaintiff's Answers to Defendant's Supplemental Interrogatories

Now comes the above-named plaintiff, David J. Rouch, who being first duly sworn, deposes and says as follows:

1. In answering these Interrogatories, based on what I have been told by my attorney, that actual malice (knowledge of falsity of statements made or reckless disregard of their truth or falsity) and common law malice or malice in law (false and defamatory statements made without sufficient cause or excuse) are more often tha[n] not supported by the same factual basis except in unusual instances. He further advised that in ordinary cases, malice can be implied from the defamatory nature of the statements and the fact that they are false. Malice can be proved by both intrinsic evidence and extrinsic evidence. Therefore, I am unable to necessarily distinguish whether the following facts will suport [sic], as you say, "actual malice" or "common law malice," but are those facts as I best know them at this time which I will rely on in support of my Complaint:

a. That the article was false;

b. The style and tone of the original article and the alleged retraction;

c. That normally the names of criminal defendants are not

A claim that the facts have not been adequately stated cannot properly be raised after the trial has commenced, let alone for the first time in the Supreme Court and without even an assignment of error. Ordinarily, the allegations in the complaint are fleshed out during the discovery process, at status conferences, and in mediation statements.

---

published by the Defendant newspaper until the criminal defendant has been formally charged or arraigned in Court;

d. That the Defendant failed to publish the fact that no formal charges had been brought against the Plaintiff and that he had been released from custody until approximately one year later when Plaintiff made a demand for retraction upon Defendant;

e. That the Defendant did not publish the fact that another individual was arrested for the same charges subsequent to Plaintiff's release, at the time of his arrest;

f. That Plaintiff is not a public or quasi-public person;

g. That the publication in question was not a qualified or absolute privilege of the Defendant;

h. That prior to publishing the article in question, Defendant made no investigation whatsoever to determine whether or not the facts as published were true;

i. That Defendant only made a telephonic inquiry of police departments to acquire the information published;

j. That Defendant made no effort to determine the truthfulness of the charge or facts contained in the publication;

k. That Defendant made no effort to contact Plaintiff concerning the facts as published;

l. That no immediate necessity existed which would have justified the libelous publication of the article in question without making reasonable efforts to confirm the truthfulness of the facts set forth in the publication;

m. That Defendant has no standards, instructions, or guidelines to protect private citizens such as the Plaintiff from libelous publications;

n. That despite a demand from Plaintiff, Defendant failed to publish a retraction;

o. That Defendant has not at any time, by conduct or otherwise, demonstrated the slightest interest or concern of Plaintiff's rights prior to or subsequent to the publication in question.

2. See #1 above.

3. See #1 above.

4. See #1 above.

5. See #1 above.

The approach of the concurring opinion, if observed generally, would elaborate on motion practice, to the dismay of bench and bar, and would needlessly increase the paper flow and the already heavy cost of litigation.

III

The Enquirer and News moved for a remittitur of the $1,000,000 verdict, which was denied. The denial was assigned as error in the Court of Appeals. The Court of Appeals, on consideration of this Court's decision in *Palenkas v Beaumont Hosp,* 432 Mich 527; 443 NW2d 354 (1989), concluded that the judge did not err in denying a remittitur. The Enquirer and News did not challenge that conclusion in this Court.