**Julian M. LEVANT, Plaintiff,**

v.

**AMERICAN HONDA FINANCE CORPORATION d/b/a Honda Financial Services, Defendant.**

**No. 04–CV–70030–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 15, 2005.

Samuel M.J. Simon, Birmingham, MI, for Plaintiff.

S. Thomas Wienner, Weinner & Gould, Sidney L. Frank, Tamara Fraser, Frank, Stefani, Troy, MI, Kevin H. Breck, Clark Hill, Detroit, MI, Robert J. Schuckit, Katz & Korin, Indianapolis, IN, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Michigan Collection and Credit Reporting Practices action is presently before the Court on the Motion for Summary Judgment filed by Defendant American Honda Finance Corporation ("AHFC") on the five counts asserted against it in Plaintiff Julian Levant's Amended Complaint.[1] Plaintiff has responded to AHFC's Motion. Having reviewed and considered the parties' briefs and supporting documents, and having heard the oral arguments of counsel on February 3, 2005, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

1. In his Amended Complaint, Plaintiff had also asserted claims against three credit reporting agencies—Equifax Credit Information, Experian Information Solutions, Inc., and Trans Union. All of the claims against these defendants have been dismissed, leaving only Plaintiff's claims against AHFC for adjudication.

2. Abigail Levant and "Levant Properties, LLC" were listed as Lessees on the Lease Agreement (Abigail's name was typed on the Agreement and Levant Properties LLC was hand-written immediately below Abigail's name) and Abigail signed it. *See* Defendant's Ex. A. Although Plaintiff Julian Levant testified that Abigail and Levant Properties "jointly" leased the car [*see* Plaintiff's Dep., pp. 19–20], there is nothing in the Lease Agreement itself to indicate that Abigail executed the Agreement both on her own behalf and on behalf of the company. In any event, Plaintiff believed that, from the time his daughter executed the Lease, the car was the property of Levant Properties. *See* Plaintiff's Dep., p. 18, where, while explaining the subsequent execution of a "Lease Transfer Agreement", Plaintiff testified,

> My daughter was gone. My regional supervisor needed a vehicle for his personal use and for business to drive. He didn't have a

### II. FACTUAL BACKGROUND

On August 2, 2000, Abigail Levant, Plaintiff Julian Levant's daughter, leased a 2000 Honda Passport from Tamaroff Buick in Southfield, Michigan.[2] The Closed–End Vehicle Lease Agreement executed by Ms. Levant provided for 36 monthly payments of $424.99 and provided that American Honda Finance Company would administer the Lease. [*See* Defendant's Ex. A.] The Lease Agreement further provided that failing to make any payment when due would constitute a default under the Agreement and that, in the event of default, AHFC could exercise any or all of several remedies without giving advance notice. [*See* Defendant's Ex. A.][3] In the event of default, the Lease further authorized AHFC to submit negative credit information regarding her account. *Id.*

> car, and so it just made sense to keep— ***Levant Properties already had the lease.*** It just made sense to continue it. . . .
>
> *Id.* (Emphasis added.)

3. The Default provision of the Agreement provided, in pertinent part, as follows:

> **DEFAULT:** I will be in default if (a) I fail to make any payment when due under this Lease. . . . **Remedies:** In the event of default, Lessor may do any or all of the following without giving advance notice to me: (q) take any reasonable measures designed either to correct the default or save Lessor from loss . . .; (b) terminate the Lease and my rights to possess and use the Vehicle; (c) take possession of the Vehicle by any method or manner permitted by law; (d) determine my termination liability on an early termination basis which I agree to pay immediately. . . . All of Lessor's rights are cumulative and the taking of any action will not prevent the taking of any other action. I also agree to pay Lessor for all collection and legal costs, including all reasonable attorneys fees and court costs Lessor incurs. . . .
>
> *See* Defendant's Ex. A.

Over the course of the ensuing 18 months, Ms. Levant used the 2000 Honda Passport in her capacity as property manager of Levant Properties, L.L.C.,[4] and also used the car for personal purposes[5] Plaintiff acknowledged in his deposition that although Ms. Levant made some of the payments using her personal checking account, not all of the payments were made by her personally; Levant Properties frequently made the Lease payments. *See* Julian Levant Dep., Defendant's Ex. B. p. 13–15. Mr. Levant further acknowledged that in the company's check registers, the Lease payments were recorded with the notation "business vehicle." *Id.* at pp. 14–15.

Abigail Levant died on January 28, 2002. Levant Properties thereafter assumed the Lease obligations on the Honda Passport, with Plaintiff Julian Levant listed as "Guarantor." The Lease Transfer Agreement and related application materials executed by Julian Levant on behalf of Levant Properties and on his own behalf as Guarantor, expressly provided that Levant Properties would use the Honda Passport for business purposes. *See* Defendant's Ex. C.[6] Levant Properties is also the named insured on the vehicle. *See* Defendant's Ex. D.

Julian Levant testified in his deposition that after Abigail's death, the vehicle was used by Dennis Lefevre, a Levant Properties regional supervisor. Plaintiff's Dep., pp. 18–19. Mr. Lefevre drove the vehicle to and from the company's various mobile home parks for which he was responsible.[7] Plaintiff testified that he viewed the car as "a perk" for Mr. Lefevre and it was treated by Levant Properties as an expense to the business for tax purposes. [Plaintiff's Dep., p. 20.]

It is undisputed that commencing in October 2002, Levant Properties stopped making the payments required under the Vehicle Lease. Plaintiff also does not dispute that he was a guarantor of the Lease obligations and personally received notice of these defaults.[8] AHFC notified Levant Properties and Levant of the defaults commencing in September 2002 through February 2003, both in writing and telephonically. *See* Defendant's Ex. E. The notices were sent to both Plaintiff's home address and to his business address, *id.*, and Plaintiff acknowledged his receipt of them. *See* Plaintiff's Dep., pp. 35–36; 38–40.

On February 21, 2003, AHFC repossessed the Honda Passport and mailed to Levant Properties and Plaintiff a notice of private sale scheduled for March 2, 2003. *See* Defendant's Ex. G. Also on February

---

4. Levant Properties owns and operates several mobile home parks in Michigan. Abigail Levant was responsible for general management of the parks.

5. Levant Properties is a limited liability company whose members at the time were Julian Levant, his wife, and his two daughters, Abigail and Katie.

6. The Lease Transfer Agreement indicates the following in the space provided for identifying the "Transferee (New Lessee"):

Levant Properties, LLC
176 S Andrews
Lake Orion MI 48362
SS# (or Tax ID#) tax # 38–3508844

Julian M. Levant (Guarantor)
176 S. Andrews
Lake Orion Mi 48362
☑ Individual ☑ Partnership ☑ Corporation **X** Limited Liability Co.
Intended Use of Vehicle
☑ Personal **X** Business

7. According to Plaintiff, Lefevre also used the car for personal purposes.

8. Plaintiff testified in his deposition that the period following his daughter's death was "a very difficult period in [his] life," and he and Levant Properties fell into arrears on various accounts, including the AHFC account. *See* Plaintiff's Dep., pp. 35–38.

21, 2003, AHFC advised the Equifax credit reporting agency of the payment defaults and the repossession of the vehicle. *See* Defendant's Ex. H. Plaintiff does not dispute the accuracy of this credit history information.[9]

Levant Properties subsequently contacted AHFC, obtained a payout figure, and ultimately purchased the vehicle outright for $17,736.09 on March 21, 2003. On April 1, 2003, AHFC authorized Levant Properties to pick up the vehicle from the repossession company, U.A.R., Inc. AHFC also advised Levant Properties that it could not obtain possession of the vehicle until it paid U.A.R.'s $375 repossession charge. On April 30, 2003, Levant Properties retrieved the vehicle and shortly thereafter, AHFC sent the company a bill of sale and certificate of title reflecting the transfer of ownership. *See* Defendant's Ex. K.

On July 11, 2003, U.A.R., Inc. invoiced AHFC $375. Based upon receipt of this invoice, AHFC believed that Levant Properties and/or Mr. Levant had failed to pay the costs of repossession. AHFC promptly paid this bill and on July 29, 2003, sent Levant a written notice, and made one telephone call to Mr. Levant, advising him that the account still remained past due in the amount of $375, i.e., the amount of U.A.R.'s repossession charge. (After Plaintiff initiated this lawsuit, AHFC learned that U.A.R. had mistakenly invoiced AHFC, and that Levant Properties,

in fact, had paid this charge. On April 8, 2004, U.A.R. reimbursed AHFC the $375 it had paid. AHFC did not report any adverse credit information based upon the $375 repossession charge.)

On August 6, 2003, Plaintiff mailed a letter to AHFC (1) objecting to *any* adverse credit reporting by AHFC; (2) objecting to AHFC's recent correspondence concerning the $375 repossession charge; and (3) advising that he intended to file suit against AHFC. On August 14, 2003, Levant again wrote AHFC, this time representing that he had sustained damages totaling $4 million.[10] Levant further stated in this letter:

> To repair the damage[,] I will need [a] letter, acceptable to my counsel, acknowledging the error and Honda Finance's advisement of retraction to all three credit bureaus, all persons or firms to whom they supplied information.

Defendant's Ex. Q.

Although under no obligation to do so, believing that Levant would thereby be placated and would not file suit, on August 18, 2003, AHFC provided Levant with a letter stating that AHFC had changed the credit report to reflect no defaults and no repossession. *See* Defendant's Ex. R. The three credit bureaus completed these changes in Levant's personal credit history as of November 30, 2003. *See* Defendant's Ex. S, p. 4.

---

9. Plaintiff's primary complaint is that AHFC's disclosure of this information appears on his personal credit report. He contends that AHFC should have limited this disclosure to the corporate entity, Levant Properties. *See* Plaintiff's Dep., p. 55.

10. Levant claims he sustained such damages because he was unable to obtain more favorable refinancing on several outstanding commercial mortgage loans that he had. *See* Complaint, ¶¶ 18, 28. He claims that the denial of favorable interest rates was solely

due to AHFC's adverse credit reporting concerning the defaults on the Honda Passport Lease. Amended Complaint, ¶¶ 12–16, 18, 28. However, Levant's mortgage broker, Rosalind Farr of Mortgage Realty Alliance, testified in her deposition that Levant had no chance of obtaining lower mortgage rates from any lender because of substantial and ongoing defaults Levant had incurred with Flagstaff Bank, the current lender on these mortgages. *See* Farr Dep., Defendant's Ex. O, pp. 115–116; *see also* Defendant's Ex. P.

After all corrections were completed, Levant attempted to obtain refinancing through his mortgage broker, Realty Mortgage Alliance, for the mobile home parks. Rosalind Farr of Realty Mortgage Alliance testified in her deposition that she submitted a refinancing application to only one mortgage lender, Column Financial in late December 2003 but that Column Financial declined to refinance Levant's loans based upon considerations having nothing to do with any negative credit information provided by AHFC.[11] She testified that Levant thereafter instructed her in January 2004 to cease all efforts to obtain refinancing for the mobile home parks because of Levant's pending litigation against AHFC and the credit bureaus.

Notwithstanding his having received confirmation that his credit reports had been cleared with regard to the AHFC account at least as of November 30, 2003, on December 4, 2004, Plaintiff filed this lawsuit against AHFC, Equifax, Experian and Trans Union. As noted above, all claims against Equifax, Experian and Trans Union have been dismissed.

In his Amended Complaint, Levant claims that AHFC violated Michigan's Collection Practices Act, M.C.L. § 445.252 et seq. (the "MCPA") and Michigan's Credit Reporting Practices Act, M.C.L. § 445.271 et seq. (the "MCRPA"). Levant also claims that AHFC tortiously interfered with his business relationship with his mortgage broker, Realty Mortgage Alliance, defamed his business reputation and intentionally inflicted emotional distress upon him. At the February 3, 2005 hearing, Plaintiff voluntarily dismissed his claims of tortious interference with business relationship and intentional infliction of emotional distress, leaving only the two statutory claims and the defamation claim for adjudication. AHFC now seeks entry of summary judgment in its favor on all three of these claims.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[12] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

---

11. Ms. Farr testified that the lender sent representatives to view the mobile home park properties and their notes indicated that the lender deemed the properties an inappropriate risk. *See* Farr Dep., Defendant's Ex. O, pp. 58–59, 99–100.

12. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant AHFC's Motion for Summary Judgment in this case.

## B. *THE MCPA DOES NOT APPLY TO AHFC'S COLLECTION EFFORTS*

■ The Michigan Collection Practices Act prohibits abusive collection efforts only with respect to obligations arising out of a "purchase made primarily for personal, family, or household purposes." M.C.L. § 445.251(a). The Act does not apply to collection efforts on business debts, even where such collection efforts involve an individual guarantor. *See Margita v. Diamond Mortgage Corp.,* 159 Mich.App. 181, 406 N.W.2d 268, 270 (1987) (concluding that the plain use of the statutory language "primarily for personal, family, or household purposes" demonstrates the Legislature's intent to exclude obligations incurred for business purposes, and thus, finding that Credit Reporting Practices Act "is directed at the nature of the transaction, not the persons involved.") *See also, Zine v. Chrysler Corp.,* 236 Mich. App. 261, 600 N.W.2d 384, 392–394 (1999) (construing identical language in the Michigan Consumer Protection Act, the court found that even though plaintiff also used his truck for personal purposes, where the evidence established that the truck was purchased primarily for business use, the plaintiff had no cause of action under the statute.)

■ Whether the Honda Passport leased by Abigail Levant and then later by Levant Properties was used primarily for personal or business purposes is the precise issue presented in this case. Plaintiff argues that because it was Abigail Levant who originally leased the vehicle, the Court should focus on Abigail's intended and actual use of the vehicle during her lifetime in deciding this issue. Plaintiff contends that Abigail used the car primarily for personal purposes. Defendant AHFC, on the other hand, argues that the Court should focus on the use of the vehicle after Levant Properties assumed the Lease.

Defendant's position is that this is the proper temporal focus because the indebtedness at issue was incurred during the post-lease assumption period and it is AHFC's post-lease assumption collection activities that Plaintiff challenges in this lawsuit. Defendant argues that after Levant Properties assumed the Lease, the car was used primarily for business purposes. (Defendant also disputes Plaintiff's claim as to the nature of the use of the car during Abigail Levant's lifetime and contends that even then, the car was not used primarily for personal purposes.)

Although both parties have presented credible legal arguments in support of their respective positions—and this is indeed an interesting question of statutory construction—the Court need not decide the temporal focus issue because it finds that, regardless of whether the focus is on the pre- or post-lease assumption period, the evidence of record as a whole simply does not establish that the vehicle was purchased or used "primarily for personal, family, or household purposes."[13] The record evidence establishes the following.

First, although on the original Lease document, the box marked "personal, family, or household" was checked as the "primary use" of the Honda Passport, there is some evidence which indicates that Abigail Levant's intent was to lease the vehicle for business use. Although there is no indication that Abigail executed the Lease in anything other than her personal capacity, she was the general manager of Levant Properties and "Levant Properties" was handwritten as one of the lessees along with Abigail on the Lease.[14] Indeed, Plaintiff Julian Levant testified in his deposition that Abigail and Levant Properties "jointly" leased the vehicle. *See* Plaintiff's Dep., pp. 18–19.

The record evidence of this case further establishes while Abigail was still alive and managing the business, Levant Properties made some of the payments on the Lease and payments that were made by Ms. Levant using her personal checking account were reimbursed by the company or one of its mobile home businesses. *See* Plaintiff's Dep., pp. 13–15. In the company's check registers, all of these Lease payments were recorded with the notation "business vehicle." *Id.* at pp. 14–15.

Moreover, there is no dispute that Abigail Levant used the vehicle to travel to the various Levant Properties' mobile home parks in the course of her employment. Although her father testified that she also used the car for personal purposes, there is no evidence to support that this was the primary use of the vehicle. *See Zine, supra* (plaintiff's personal use of truck did not render the Michigan Consumer Protection Act applicable where the truck was used by plaintiff 80 percent of the time in connection with his work).

Furthermore, it is undisputed that after Abigail's death, the only Lessee of the Honda was a business—Levant Properties. *See* Lease Transfer Agreement, Defendant's Ex. C. Plaintiff Julian Levant who executed the Lease Transfer Agreement on behalf of the company specifically indicated on the Agreement that the "Intend-

---

**13.** This statutory language of a "purchase primarily for personal, family, or household purposes" might imply that the only focus of statutory interpretation should be the represented use at the point of initial purchase or lease. However, this interpretation would completely contradict the stated intent of the statute that it apply only to consumer transactions, as a purchase could be represented as a consumer transaction and then immediately converted to a business use. In any event, even this interpretation is unavailing here, for the reasons set forth below.

**14.** Abigail's name was typed on the Lease, as was the "x" in the box for "personal, family or household" primary use.

ed Use" of the vehicle was "Business," not "Personal" use. *Id.* The company, Levant Properties, not Plaintiff Julian Levant, was identified as the "named insured" for the vehicle and Levant Properties made all of the payments on the Lease. *See* Ex. D and Plaintiff's Dep., pp. 12–13.

Moreover, Plaintiff testified in his deposition that since the execution of the Lease Transfer Agreement, the vehicle was used by Levant Properties' Regional Supervisor Dennis Lefevre to drive to and from the various mobile home parks managed by the company. In Plaintiff's view, the car was a "perk" provided by the company to Lefevre. However, as Plaintiff testified in his deposition, the car was treated by Levant Properties as an expense to the business for tax purposes. *See* Plaintiff's Dep., p. 20. Although Mr. Lefevre also used the car for personal purposes, the above-discussed undisputed record evidence demonstrates that it can hardly be said that the car was leased "primarily for personal, family or household purposes."

In sum, as the foregoing discussion demonstrates, whether the focus is on Abigail's original execution of the Lease and the use of the vehicle during her lifetime, the period of time after the execution of the Lease Transfer Agreement, or the entire Lease term as a whole, the Court finds that Plaintiff has failed to establish that the Honda Passport was leased *"primarily* for personal, family or household purposes." Therefore, Plaintiff has failed to make out a *prima facie* claim of violation of the Michigan Collection Practices Act. Accordingly, the Court will grant Defendant AHFC's Motion for Summary Judgment on this claim.

## C. *PLAINTIFF HAS FAILED TO ESTABLISH A CLAIM UNDER THE MCRPA*

Like the Collection Practices Act discussed above, Michigan's Credit Reporting Practices Act, M.C.L. § 445.271 *et seq.*, also applies only to credit reporting of indebtedness incurred "for personal, family or household purposes." M.C.L. § 445.271(d). As set forth in Section B, *supra*, the debt owed to AHFC which AHFC reported to the credit bureaus was *not* a debt incurred "for personal, family or household purposes."

■ Furthermore, the section of the Act upon which Plaintiff here relies, § 445.272, only applies to reporting of adverse credit information *about a cosigner* on a loan. The Act expressly excludes guarantors from the definition of "cosigner." *See* M.C.L. § 445.271(c).[15] Plaintiff Levant was not a cosigner but rather was a guarantor on the Lease Transfer Agreement. *See* Defendant's Ex. C. Indeed Plaintiff himself referred to himself as the guarantor of Levant Properties obligations under the Lease in his deposition testimony: "They [AHFC] notified me as guarantor that [the Lease] was in arrears and they were calling the lease and I paid it." Plaintiff's Dep., p. 40.

■ However, even assuming *arguendo* that Plaintiff is covered under the MCRPA, Plaintiff has failed to establish a violation of § 445.272.

Section 445.272 provides, in pertinent part:

Before reporting adverse information about a cosigner to a consumer reporting agency ... concerning the obligation that was cosigned ... or taking any

---

**15.** Section 445.271(c) provides, in pertinent part:

"Cosigner" means a natural person who renders himself or herself liable for the

obligation of another person without compensation.... The term does not include ... a person who has executed a guarantee....

collection action on the obligation against the cosigner that was cosigned, other than orally communicating the information permitted in subdivision (a), a person shall do both of the following: (a) Send to the cosigner, by first class mail, a notice indicating that the primary obligor has become delinquent or defaulted on the obligation and that the cosigner is responsible for payment of the obligation [and]

(b) Allow the cosigner not less than 30 days from the date that the notice was sent to respond to the notice by doing either of the following:

(i) Paying the amount then due and owing under the obligation [or]

(ii) Making other arrangements satisfactory to the person to whom the obligation is owed.

Here, the record evidence establishes that AHFC sent Levant numerous notices of non-payment and that AHFC waited far longer than 30 days after first providing Levant with the requisite notice before reporting the negative credit history. It is undisputed that AHFC sent Levant notice of default on September 11, October 12, December 12, 2002, and on January 13 and February 10, 2003. *See* Defendant's Ex. E. Plaintiff admits having received these notices. *See* Plaintiff's Dep., pp. 35–38. AHFC did not report any adverse credit information concerning Plaintiff's indebtedness to any of the credit bureaus until after the repossession of the vehicle on February 21, 2003, i.e., almost **six months** after first providing Plaintiff with notice of the defaults.[16] Thus, AHFC complied with Section 445.272.

For all of the foregoing reasons, the Court finds that Plaintiff has failed to make out a claim of violation of the

MCRPA. Accordingly, summary judgment will be entered in favor of Defendant AHFC on this claim.

## D. *PLAINTIFF HAS FAILED TO MAKE OUT A COGNIZABLE CLAIM OF DEFAMATION*

Plaintiff claims that by reporting negative credit information concerning his indebtedness to AHFC, AHFC defamed him.

■ To prevail on a claim of defamation, a plaintiff must prove (1) a false and defamatory statement concerning him; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) actionability *per se* or the existence of special harm caused by the publication. *Rouch v. Enquirer & News,* 440 Mich. 238, 251, 487 N.W.2d 205 (1992).

■ Plaintiff Levant does not challenge the truthfulness of the information disclosed by AHFC to the credit reporting agencies; he merely protests that such information was disclosed on his personal credit history. This is not sufficient to make out a claim of "defamation." The principal requisite of a claim of defamation is the disclosure of *false* statement. Since Plaintiff admits that the disclosures he complains of were truthful, he cannot make out claim of defamation as a matter of law.

### CONCLUSION

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant American Honda Finance Corpo-

---

**16.** Although Plaintiff argued at the hearing that the notices were merely notices that the payments were past due and, as such, were not notices of "default," the plain language of

the Lease Agreement provided that failure to make any payment when due constitutes a "default" under the Agreement.

ration's Motion for Summary Judgment be, and hereby is, GRANTED.

Defendant AHFC being the only remaining defendant in this action,

IT IS FURTHER ORDERED that Plaintiff's Complaint be, and hereby is, DISMISSED, in its entirety, with prejudice.

Let Judgment be entered accordingly.

*JUDGMENT*

The Court having this date entered an Opinion and Order granting Defendant's Motion for Summary Judgment and dismissing Plaintiff's Complaint in its entirety, with prejudice,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that a JUDGMENT OF DISMISSAL, WITH PREJUDICE, be and hereby is entered.